Williams, Judge,
delivered the opinion:
This is a suit brought under the patent act of 1910, as amended July 1, 1918.
The suit involves the alleged infringement of two United States patents, numbers 1178092 and 1223598, granted to William Mills, a British subject, and, as sole and exclusive owner of the patents, plaintiff in the present action. It has been previously established that a British subject may maintain suit against the United States Government for infringement of his United States patents (see Brodie v. United States, 62 C. Cls. 29), and we pass directly to a consideration of the above enumerated patents and a comparison of them with the Government devices.
The subject-matter herein involved relates to what is known as hand-grenades. A hand-grenade is an ordnance missile of such a size that it can be readily grasped in the hand and thrown at the enemy. Hand grenades in general comprise a hollow corrugated metal casing filled with a *270 bursting charge which when it explodes causes fragmentation of the casing. The explosion of the bursting charge is initiated by the release of a firing-pin by means of suitable mechanism during the act of throwing the grenade. The released firing-pin explodes a cap which in turn ignites a fuze adapted to burn for a few seconds which in turn explodes the bursting charge at the approximate time at which the thrown grenade reaches its objective.
Both of the patents in suit relate to safety features designed to prevent a premature explosion of the grenade.

Patent No. 1MS598

The safety features which form the subject matter of this patent are directed to the release mechanism for «the firing-pin. The structure disclosed by the drawing and specification comprises a hollow grenade body adapted to be filled with a bursting charge ignited by a percussion cap in conjunction with a short time fuze. The percussion cap is located at the bottom of a central axial chamber, which also contains a spring-impelled striker or firing-pin held in a retracted position above the percussion cap. This spring-impelled striker is maintained in this position by engagement of its upper end with the short end of a pivoted release lever, the long end of which extends downward and is formed or bent to approximate the exterior contour of the grenade casing. The form and location of this extended portion of the lever are for the purpose of enabling it to be grasped and held against the exterior of the grenade by the hand of the thrower.
The lever is normally maintained in this position by an element defined in the patent claims as a “ retaining means.” As disclosed by the specification and drawing this element comprises a split pin of pliable metal inserted through perforations or lugs on the exterior of the casing and adjacent the lever.
When it is desired to use the grenade the thrower grasps the same in his hand in such a manner as to hold the release lever against the body of the grenade and then removes or withdraws the retaining means or the pin, thus leaving the release lever free except for the grasp of the hand. When *271 'the grenade leaves the hand of the thrower the lever is released and disengages the spring-actuated firing-pin or striker which then is impelled against the percussion cap and initiates the subsequent explosion of the grenade.
The patent monopoly, as expressed by the claims in suit, is directed in substance to the location of the retaining means in such position as to cooperate with that portion of the release lever in the vicinity of the firing-pin or striker, which it controls.
The claims in suit are as follows:
“ L A grenade or the like, • said grenade comprising in combination means for firing or exploding the grenade, an externally disposed lever adapted to control the firing means, and retaining means for said lever arranged in connection with the part or half of the lever in the vicinity of the said firing means which it controls.
“ 2. A grenade or the like, said grenade comprising in combination means for firing or exploding the grenade, an externally disposed lever adapted to control the firing means, and manually removable retaining means for said lever arranged in connection with the part or half of the lever in the vicinity of the said firing means which it controls, the half of said lever remote from said firing means being exposed to the grasp of the hand when said retaining means is being removed.
“ 3. A grenade or the like, said grenade comprising in combination means for firing or exploding the grenade, an externally disposed pivoted lever adapted to control the firing means, and manually removable retaining means for said lever arranged in connection with the part or half of the lever in the vicinity of the said firing means which it controls, the half of said lever remote from said firing means being exposed to the grasp of the hand when said retaining means is being removed.”
The plaintiff alleges infringement of these claims by the Government device termed the Mark II bouchon, the bouchon being a unitary assembly of the firing mechanism of a hand grenade.
The bouchon Mark II consists of a die-cast member adapted for threaded engagement into the top of a grenade casing, the lower portion of the die-cast structure comprising a fuze tube which extends within the opening provided for the same within the grenade. A percussion cap is mounted *272 at the top of this tube adjacent tbe upper end of the fuze, and a spring-impelled striker plate, carrying a conical firing-pin or point, is so mounted that under the actuation of its spring the firing-pin will strike the cap. This striker plate is normally held in a cocked position remote from the percussion cap by means of a release lever, the loAver end of which has a downwardly, projecting portion approximating the exterior contour of the grenade.
This lever is not pivoted to the bouchon portion of the grenade, but has its upper end hooked over a projecting lug so as to rock or fulcrum about the same. The release lever is maintained in a normal position by a pin acting as a “ retaining means ” and located to cooperate with the upper part or portion of the release lever in the vicinity of the firing means or striker plate which the lever controls.
The method of using a Government hand grenade equipped with a Mark II bouchon is practically identical with the operation previously described, in connection with the grenade of the patent in suit. The grenade is grasped by the hand of the thrower in such a manner as to hold the release lever against the exterior of the grenade, and the retaining means is then removed. When the grenade is thrown and leaves the hand of the thrower, the lever is released and thrown off, thereby disengaging the striker plate which then fires the percussion cap and initiates the explosion.
Defendant argues that the term “ retaining means,” as used by the patentee in the claims in suit, refers to- the fixed trunnions located on the body of the grenade on which the release lever is pivoted. The patent specifically refers to the means for retaining the lever in its normal position in relation to the grenade as “ a split pin h adapted to pass through perforations in the lever.” This element is not only described in the specification but is shown in the drawings so clearly that no ambiguity could possible exist, and the mechanic in this art would have no difficulty to visualize exactly what this element is, what function it has, and where it is. located. This element is also specifically referred to in the opening paragraphs of the patent specification which relate to the objects and advantages of the invention disclosed *273 therein. In this connection we quote from the specification of this patent, p. 1, lines 44 to 56, inclusive :
“ The member for normally retaining the lever in relation to the body of the grenade is, according to the 'present invention, advantageously incorporated in connection with the part or half of the lever in the vicinity of the striker or member which it controls, so that during the operation of releasing the lever, the other part or half thereof can be grasped by the hand, whereby in this grasping operation the greatest possible leverage is obtained which reduces the possibility of the lever being accidentally released by the hand.” (Italics ours.)
We also find from the inspection of the file wrapper, which gives the history of the patent application which matured into the' patent in suit during its pendency in the Patent Office, that this feature has been continuously referred to and claimed.
The patent monopoly expressed by the above-enumerated claims is entirely clear and understandable to those skilled in the art, and this terminology of claims 1 and 2 applies to the Government’s structure as typified by the Mark II bouchon.
The terminology of claim 3 which specifies a “pivoted lever ” does not read upon the Government structure. The release lever used in the Mark II bouchon is not pivoted in the sense in which this term is interpreted by the specification of the patent in suit and the file wrapper thereof.
Defendant raises the issue of double patenting in its brief, pointing out in this connection that the earlier patent to Mills, #1178092, issued April 4, 1916, disclosed the subject matter of .the present patent under discussion, and stating further in its brief that this patent acted to extend the monopoly after the earlier issued patent expired. While the courts have almost universally recognized that double patenting renders the subsequent issued patent invalid, these decisions are predicated entirely upon an unlawful extension of the patent monopoly, and in order for this to exist the claims in the second patent must be directed to the same monopoly as those issued in the first patent, thereby creating the existence of a monopoly for more than the seventeen-year statutory period.
*274 This is not true in the present instance, the claims in first-issued patent all being directed to features involving the venting of the percussion cap and other related details. These claims thereby create a patent monopoly separate and distinct from the safety split pin or retaining-means feature of the present patent under discussion. No overlap exists and there is no double patenting present as regards the two Mills patents in suit.
What defendant possibly has in mind is the well-known doctrine that when an applicant receives his patent from the Patent Office his monopolies or inventions have been carved out by the terminology of his claims, and the remainder of his disclosure is presumed to be abandoned or dedicated to the public. In the present instance, however, the Mills patent #1223598 and the earlier patent #1178092, in which the disclosure occurred but is not claimed, were both based on applications filed in the Patent Office on the same day (June 15,1915), and these patents were, therefore, issued on copending applications, which clearly rebut any intent or purpose of the patentee, Mills, to dedicate to the public the monopoly created by the issuance of his later patent #1223598. This same situation was existent in Traitel Marble Co. v. Hungerford, Brass & Copper Co., 22 Fed. (2d) 259, in which the court stated as follows:
“ Calkins’ earlier patent was not part of the prior art, and it is not necessary to the validity of the claims in suit that they should embody a patentable advance over the earlier disclosure. The two applications were copending, and it is a matter of indifference which of the patents issued first, provided that the claims are for separate inventions. * * * The issuance of the first patent does not abandon the unclaimed matter in its disclosure, the pendency of the second application rebutting any such inference.”
See also In re Barton, 30 Fed. (2d) 997; Vapor Car Heating Co., et al., v. Gold Car Heating & Lighting Co., 296 Fed. 188; and Miller v. Eagle Manufacturing Company, 151 U. S. 186.
It is, therefore, held that the Mills patent, #1223598, is not void because of double patenting or previous disclosure of the monopoly claimed therein in an earlier issued patent to the same inventor.
*275 ■ We next take up consideration of the prior art. There is disclosed in the United States patent to Eoland #1126871, issued February 2, 1915, a grenade of substantially the same type as that involved in the Mills patent #1223598, under discussion. The Eoland patent discloses a grenade of hollow hemispherical shape, having located in its interior a spring-impelled firing plunger or pin which coacts with a percussion cap to initiate the explosion of the grenade. A release lever of substantially the same form and character as that embodied in the Mills patent under discussion is also disclosed, the upper end of this lever cooperating with the upper end of the firing pin to maintain the same in a cocked position. This release lever is substantially similar in mounting and functioning to the' release lever of the Mills patent, with the exception that it is not carried on trunnions but rocks or fulcrums upon the portion of the grenade body in which latter feature it more closely approximates the Government’s Mark II bouchon than does the structure disclosed in the Mills patent under discussion.
A safety retaining means is provided for this release lever by two separate mechanisms, the one being a bolt having an enlarged head located near the lower extremity of the release lever in such a manner as to normally hold it in its position and adapted to release the lever when the bolt head is turned so that a cut-away portion operates to disengage the lower end of the lever which is so shaped as to be retained against the exterior of the grenade by the hand of the thrower subsequent to release. A second retaining means is provided by means of a removable catch which is carried by two small projections on the surface of the grenade near the lower end of the lever and enters notches cut in the sides of the lever, this retaining means being releasable at the will of the thrower.
For comparative purposes we append figures taken respectively from the Mills patent in suit and the prior art patent to Eoland, the retaining means of the Mills patent being identified by the reference character h and that of the Eoland patent by the reference character 35 which refers to the cut-away portion thereof.
*276 It will be seen that the major patent over the prior art, as exemplified by the Roland disclosure, is that in the Mills construction the retaining means is located near the upper portion of the lever in the vicinity of the firing pin, while in the prior art structure the retaining means is located near or adjacent the lower end of the lever. Any patent novelty that may exist in claims 1 and 2 must be predicated solely upon the change in location of the retaining means from the lower end of the release lever to a position adjacent the upper part of the release lever and in the vicinity of the firing pin.

There is no question but what this change in location, possesses the advantage of leaving thé lower end of the release lever entirely free or exposed to the grasp of the hand during the removal of the retaining means, a feature which is emphasized in claim 3 of Mills patent #1223598,. and the question, therefore, resolves itself into whether such a change in the location of the retaining means involves the use of the inventive faculty and rises to the-dignity of invention.
Invention results from the use of the creative mental faculty and must involve original thought or discovery, in contradistinction to the mechanical skill of the mechanic: *277 or artisan in selecting, combining or rearranging the ideas of others into a more useful form.
The mere change of location of a part of a mechanism, without, the creation of a new function, is not invention, even though such change may make the machine more useful. See National Binding Mach. Co. v. Harper Paper Co., 242 Fed. 939, wherein the court said:
“ The real ground, however, of Judge Augustus N. Hand’s decision, is that the device involves no invention, and in this we concur. The placing of the cutting knife behind instead of in front of the moistener, as in Piper, was a mere mechanical improvement.”
Also, see Prepayment Gar Sales Co. v. Orange County Traction Co., 214 Fed. 402:
“ I am of opinion that there is no patentable invention in the location of the door controlling means upon the platform in accordance with the convenience of the person who is to operate it. Wherever located, its function is the same, and a change in its location involves ordinary mechanical skill, not invention.”
And also, see Voigtmann et al. v. Weis de Ridge Cornice Co. et al., 148 Fed. 848:
“ We have not overlooked the importance attached by plaintiff’s counsel to the location of the fusible link by Yoigtmann ‘at a point opposite the opening’ of the win-do av. No one can doubt that its location at or near that point more quickly subjected it to the current of rising hot air than it would have been if it had been located further away from the opening, especially so if the fire came from outside the building; but such location of the fusible link, where it reasonably should be placed to insure the performance of its intended function, is so obviously proper as not to impress it with the inventive quality. Anyone, arranging a device of the kind in question, at all familiar with the laws of physics, would instinctively place the link required to be speedily consumed where the fire would naturally reach it quickest.”
From the above the conclusion must be reached that the mere change of location of the retaining means for the release lever from the lower end of the lever to a position near the top of the release lever, while possessing a certain mechanical advantage in that the release lever is easier to *278 grasp with the hand, does not involve invention, and for this reason claims 1 and 2 of the Mills patent in suit, #1223598, are held to be invalid, as not involving invention over the prior art.
Claim 3, the “ pivoted lever ” claim, is construed as limited to the specific disclosure of the patent in suit which involves the use of a pivot pin and trunnions, and when so construed is not infringed. To construe the “ pivoted lever ” of this claim as reading upon the rocking release lever of the Government structure would enable it to be applied with equal facility to the rocking release lever of the prior art patent to Koland, and when so interpreted the claim would be invalid on the same grounds set forth in connection with claims 1 and 2.

Mills Patent No. 117809£

The safety features forming the subject matter of this patent relate to structure for venting the gases and products of combustion occasioned by the burning of the fuze in the interior of a grenade. The venting of the fuze to atmosphere at the time of its combustion prevents the fuze from being blown away from the cap or from burning under pressure which would accelerate the combustion of the fuze and lead to the possibility of a premature explosion.
In the introductory statements of the patent under discussion, the patentee states as follows:
“According to the present invention, provision is incorporated for relieving the pressure in the vicinity of the cap, this having the advantage that the fuse is effectively relieved from this pressure bodily and internally, the products of combustion are enabled to escape and satisfactory ignition and burning of the fuse are thereby enabled to take place.
“ In carrying out the present invention I provide an air passage or air passages in the vicinity of the cap, which air passage or air passages are adapted to offer a means of escape for the gases, and products of combustion. I may furthermore make provision whereby while the vent according to the present invention is incorporated, this vent, before the grenade is used, is closed to thereby exclude moisture and the like from the interior of the grenade. The vent is adapted to be opened in the operation of throwing the grenade, either by hand or by a throwing appliance.”
*279 The structure upon which the patentee relies for teaching his invention to those skilled in the ordnance art, comprises a grenade body with a release lever similar to that already discussed in connection with Mills patent #1223598. A striker chamber is formed longitudinally in the interior of the grenade and contains a spring-impelled striker capable of longitudinal movement therein, which striker functions to fire a percussion cap at the bottom of the chamber when released by the release lever. Where the upper end of the striker protrudes from the top of the grenade to connect with the release lever an annular groove is formed partly in the body of the grenade and partly in the striker, which groove is of such a character that it can be filled with wax or similar sealing substance so as to exclude air and moisture from the striker chamber located in the interior of the grenade. This seal is mechanically broken when the striker begins its movement toward the percussion cap after it has been released, and the subsequent movement of the striker stem into the grenade leaves an opening or vent for the escape of gases or combustion resulting from the explosion of the cap and the burning of the fuze, these gases passing up through the space between the striker stem and the wall of the striker chamber to atmosphere.
Another feature of the disclosure is that the fuze extending from the percussion cap to the detonator is so disposed with reference to the percussion cap that a space is left between the cap and the end of the fuze. The extent of this space is fixed by means of a series of perforations in the cylindrical portion of the cap which forms inner projecting tongues acting as stops for the extremity of the fuze when the same is inserted into the cap.
The claims in issue are as follows:
“ 1. In a grenade or the like, the combination of a spring impelled striker, a chamber for said striker, an external member controlling said striker and adapted to be released by the hand or throwing apparatus in the act of throwing the grenade, said striker being adapted to explode a percussion cap by which a time fuse is fired, of means other than the opening provided for receiving the time fuse whereby that part of the fuse is vented which is in the *280 vicinity of tbe percussion cap, said venting means opening exclusively into the striker chamber.
“ 2. In a grenade or the like in combination, a spring impelled striker, an external member controlling said striker and adapted to be released by the hand or throwing appliance in the act of throwing the grenade, said striker being adapted to explode a percussion cap by which a time fuse is fired, of means for limiting the extent to which the time fuse can approach the cap in assembling the parts, and means for venting the space between the fuse and said explosive cap.
“ 3. A grenade or the like comprising in combination, of means for exploding a cap to ignite a time fuse, and means for venting said cap, said venting means being normally sealed and the sealing being automatically broken in the act of throwing and immediately before the firing of the cap.”
“ 6. In a grenade or the like, the combination of a spring impelled striker, a chamber for said striker, an external member controlling said striker and adapted to be released by the hand or throwing apparatus in the act of throwing the grenade, said striker being adapted to explode a percussion cap by which a time fuse is fired, and means other than the opening provided for receiving the time fuse whereby that part of the fuse is vented which is in the vicinity ■of the percussion cap, said venting means opening exclusively into the striker chamber, and means normally sealing said striker chamber, said sealing means being automatically broken by the operation of said striker.”
These claims are alleged to be infringed by the Government structures known as Mark II bouchon and Mark. I bouchon.
The Mark II type bouchon structure has a dependent portion extended into the interior of the grenade when the bouchon is screwed into place, this dependent portion comprising a fuze tube. The upper end of the fuze tube is enlarged and located in this enlarged portion is a centrally disposed percussion cap, the ignition of which is by a striker plate normally held in a cocked position by means of a release lever. The operation of the release lever, its retaining means, and the striker plate have been previously discussed in connection with patent #1223598, and need not be reiterated here.
*281 A short piece of time fuze with a detonator fastened to its lower end is inserted into the bottom end of the fuze tube. There is no construction present in this fuze tube to form a gap between the upper end of the fuze and the percussion cap such as is contemplated by the patentee by the use of his tongues of metal bent inwardly to form a positive stop for the end of the fuze adjacent the percussion cap. The test of this is, that in the Government structures, if the fuze is of sufficient length, it may be pushed into the fuze tube until its end contacts with the percussion cap.
The structure of Mark I bouchon is identical in this respect. The only difference between Mark I bouchon and Mark II bouchon is in the details of the release mechanism for the striker plate. As claim 2 specifies as an element “ means for limiting the extent to which the time fuze can approach the cap in assembling parts,” this claim is held not infringed. Moreover the prior art patent to Stevens, #699586, patented May 6, 1902, shows this feature to be old and well known to those skilled in the art, this patent disclosing a combination of a cap and fuze construction in which the cap is offset and provided with a smaller diameter portion at the head so that when the fuze is inserted into the same it is prevented from extending beyond the offset portion (to quote from the language in claim 2 of the Mills patent), and forms a “ means for limiting the extent to which the time fuse can approach the cap in assembling the parts.”
In both the Mark I and Mark II bouchons the striker plate when in contact position with the cap lies within a shallow partial depression about one quarter inch deep in the top of the bouchon casting formed by the walls of the casting which surround three sides of this depression. There are four vent passages which lead from the fuze tube into this three-sided depression, the function of which is to vent the products of the combustion of the fuze and cap directly to atmosphere. Before firing, these four vent passages are sealed by a thin sealing disk of metal foil secured to the top of the fuze tube by varnish or shellac, this sealing disk covering the radially arranged vent passages as well as the *282 top of the percussion cap. When the grenade is thrown and the striker plate released in the manner already described the firing point of the striker plate strikes the cap located beneath the sealing disk of metal foil causing the same to explode and ignite the fuze. The resultant explosion of the cap blows off the sealing disk, and, therefore, opens the vent spaces to atmosphere.
A pertinent distinction between the removal of the sealing means in the Government structures, typified by the Mark I bouchon and Mark II bouchon, and that disclosed and taught by the Mills patent #1118092, is to be observed. In the Government structures the sequence of operations is such that after the striker plate is released its firing point then comes into contact with the percussion cap which in turn explodes, the resultant explosion blowing off the seal. In the Mill's disclosure the striker is released and its initial movement mechanically breaks the wax seal; the striker then continues its movement toward the percussion cap, this movement in itself forming a vent passage through the opening through which the upper end of the striker normally projects through the grenade casing prior to firing.
Claim 3 expresses the patent monopoly, as follows:
“A grenade or the like comprising in combination, of means for exploding a cap to ignite a time fuse, and means for venting said cap, said venting means being normally sealed and the sealing being automatically broken in the act ■of throwing and immediately before the firing of the cap.” •(Italics ours.)
As the operation of the Government structures is just the reverse of that specified in this claim, i. e., the seal being broken subsequent to the firing of the cap, claim 3 is held not to be infringed.
This is also true of claim 6, which specifies “ said sealing means being avitomatically broken by the operation of the striker,” which phrase quite obviously refers to the mechanical breaking of the wax seal of the Mills patent by the initial movement of the striker, an operation not found to, be present in the Government structures in which the seal is blown off by the explosion of the cap. The facts found in this case *283 show that when the firing point o,f the Government structures indents the sealing disk in order to fire the cap located immediately beneath, the sealing disk is sometimes punctured, the hole being of approximately the size of that produced by a pin point, and whatever hole may be thus incidentally formed is substantially filled by the striker point. Such puncturing of the sealing disk is clearly not for the purpose of forming a vent and no infringement can be predicated upon the accidental formation of this hole. See Brothers v. United States, 52 C. Cls. 462, 250 U. S. 88; also Isham v. United States, No. 33966, decided March 7, 1932.
For convenience of further consideration of claim 6, we paraphrase the same, as follows:
In a grenade or the like, the combination of—
a spring impelled striker,
a chamber for said striker,
an external member controlling said striker and adapted to be released by the hand or throwing apparatus in the act of throwing the grenade, said striker being adapted to
explode a percussion cap by which a time fuze is fired,
and means other than the opening provided for receiving the time fuze whereby that part of the fuze is vented which is in the vicinity of the percussion cap,
said venting means opening exclmsimel/y into the striker chamber,
and means normally sealing said striker chamber, said seeding means being automatically broken by • the operation of said striker.
One of the elements specified by this claim is “ a chamber for said striker.” When the Mills disclosure is referred to for the purpose of securing the patentee’s definition of this term, it is found to relate to the cell or cavity containing a striker and entirely inclosed within the body of the grenade and extending longitudinally therein. Such definition as is thus applied to this phrase by a consideration of the Mills disclosure, therefore, appears to be the usual and proper definition of the term “ chamber,” which is defined in Webster’s Dictionary as “ a compartment or cell; an inclosed *284 space or cavity.” No such equivalent “striker chamber” is found in either Mark I bouchon or Mark II bouchon, both of which merely have a slight depression at the top of the bouchon and exterior of the grenade, which depression only has walls on the three sides thereof, and which, therefore,, can not be contemplated or considered as “ an inclosed space or cavity.”
Claim 6 also specifies “ said venting means opening exclusively into the striker chamber.” The venting passages of the Mills structure open freely into the striker chamber which is itself sealed, from atmosphere, while in the Government structures the venting passages themselves are normally sealed until after explosion of the cap. After the explosion of the cap and the blowing off of the seal the vent passages of the Government structures permit exit of the gases to atmosphere and it is impossible to find any application of the word “ exclusively ” to the Government structures.
A construction of this claim is not warranted which would eliminate the word “ exclusively ” which it must be assumed was a desired qualification on the part of the patentee. See Crown Cork & Seal Co. v. American Cork Specialty Co., 211 Fed. 650; also Neva-Slip Shirt Waist Grip Co. v. Marcon Mfg. Co., 215 Fed. 117, 122, in which the court aptly stated:
“An express statement in a claim, which is in accord with the specifications and drawings, can not be construed to mean something different, nor can it be reconstructed so as to eliminate the limitations indicated in the specifications and drawings and shown by the literal meaning of the claim.”
Still further distinction is found in the fact that claim 6 specifies “means normally sealing said striker chamber.” The seal found in the Government structures is located at the bottom of the depression immediately over the percussion cap and the 3-sided depression is open at all times to atmosphere. Claim 6 is held not infringed.
Claim 1 is substantially similar to claim 6 with the exception that it is not limited to and does not include as an element “ means normally sealing the striker chamber.” What has just been stated with reference to the term “striker *285 chamber ” and the nonexistence of this element in the Government structures and the distinction as regards the venting means opening exclusively into the striker chamber, applies with equal force to claim 1, and this claim is therefore held not infringed.
Defendant urges the invalidity of claim 1 and directs attention to its aggregative character.
We note the very close similarity between the structures called for by claim 1 and that disclosed by the prior art Swiss patent to Fogliardi, #47137, issued October 4, 1909, which discloses a hand grenade possessing all of the elements called for by claim 1 with the- exception of “ means other than the opening provided for receiving the time fuse whereby that part of the fuse is vented which is in the vicinity of the per-cussipn cap.” This latter feature appears to be very old and well known in the ordnance art as exemplified by patents to Alger, #36553, issued September 30, 1862, and Hathaway, #547850, issued October 15, 1895.
We would give this further consideration, but this appears to be unnecessary in view of the fact that no infringement has been found to exist as to Mills patent #1178092.
Defendant in its brief discusses the question of notice as required by sec. 4900, Revised Statutes. In view of the conclusions reached it appears unnecessary to discuss this question, particularly as it is more directly related to that phase of the case which deals with damages or compensation, and which under the present practice of this court is not ordinarily taken up until after a determination has been had of the questions of validity and infringement.
The petition will be dismissed. It is so ordered.
Wi-ialet, Judge; LittletoN, Judge; GREEN, Judge; and Booth, Chief Justice, concur.