DowNey, Judge,
delivered the opinion of the court:
The plaintiff sues to recover for the alleged use by the-United States, without license or lawful right, of a patented invention covered by U. S. Letters Patent No. 1251959 issued to him on January 1, 1918. When he filed his application for said patent he was a British subject residing in London,. England. When said letters patent were granted and when this suit was commenced on November 4, 1920, he was still a British subject although on December 2, 1919, he had declared his intention to become a citizen of the United States..
A jurisdictional question is first for consideration. It is contended that the plaintiff, being at the time he commenced this suit an alien, a subject of the King of Great Britain, might not sue in this court because a citizen of the-United States could not have prosecuted such a suit in the-courts of Great Britain.
The contention, briefly stated, is that the act of June 25,. 1910, 36 Stat. 851, under which, as amended by the act of July 1, 1918, 40 Stat. 705, this suit is brought, is a statute-contemplating appropriation under the power of eminent domain (citing, among others, in support of the proposition,, the case of Crozier v. Krupp, 224 U. S. 290), that there was in this case no intention to appropriate plaintiff’s patent, if one he had, and no circumstances giving rise to an implied contract to pay, but that the use was a tortious infringement by the United States, that such a claim could not be prosecuted against the Crown under the laws of Great Britain and that therefore the plaintiff may not come into this court under section 155 of the Judicial Code.
The proposition has been elaborately and ably argued both by brief and orally and the argument supported by a wealth of authorities. We do not, however, consider it in detail because the solution of the question seems to us-to rest upon a construction of section 155 and our view of that section of the code does not agree with that con *46 tended for by counsel, and renders it unnecessary to determine the correctness or otherwise of counsel’s contention as to the nature of this action.
Section 155 gives the right to prosecute claims against the United States in this court to “ aliens who are citizens or subjects of any government? which accords to citizens of the United States the right tojprosecute claims against such government in its courts.” It is conceded in argument “ that United States citizens have the same standing in British courts as do British subjects,” but contended that “neither could or can prosecute an action for tortious infringement against the Crown.” The contention implies too narrow a construction of section 155 while the concession embodies the true spirit of the section. It is a “ reciprocity ” provision and the admission of citizens of the United States to all the rights of British subjects in British courts certainly embodies a full measure of reciprocity. The exclusion suggested is operative against British subjects as well as American citizens. The true test is not whether a citizen of the United States may prosecute an action of a particular nature in a British court but whether the doors of British courts are open to American citizens for the prosecution of “ claims ” against the Crown, but necessarily only such claims as might be prosecuted by British subjects, for there as here there are classes of action as to which the sovereign has not consented to be sued. We think this plaintiff has standing in this court.
""~We come to consider the plaintiff’s case upon its merits. During the World War he was engaged in developing and, as a contractor, in manufacturing for the British Government steel “ helmets or head shiélds ” for the use of its army. On August 16,1915, he filed application for a British patent on “ an improved helmet or head shield,” filed his complete specifications on February 16,1916, and a patent was allowed on August 10, 1916. On June 27, 1916, he filed application in the U. S. Patent Office for a patent on improvements in helmets or head shields, on September 17, 1917, after rejection of all his original claims, he canceled them and filed new claims on which the patent in suit was issued to him on January 1, 1918. In both 'the British and United States *47 patents the specifications declare that “ The present invention relates to helmets or head shields for military, mining, and the like use.”
It is hardly worth while to argue the proposition that there is and for centuries has been no novelty about helmets or head shields or some form of protective head covering, mostly in the old days for military purposes and later for other purposes as well. The prior art as recited in the record goes back to Homer’s Iliad and includes publications dealing with helmets as used centuries ago. If not always called “ helmets ” they were always in fact “ head shields.” Encyclopaedias, histories, and like publications are full of the subject. They were quite commonly of metal and included some sort of lining or head covering to the end that the metal need not come in direct contact with the head. As early as the fifteenth century helmets or hoods of mail or metal in other form were worn under which was used a sort of cap or padded cloth or hide fitting the head so that the cap was clamped to the head by the shell, the latter necessarily being removable without disturbing the inner cap or, in effect, lining.
During the World War the need of a protective head covering became apparent and it was equally apparent that it should be of such construction as not only to protect the head from blows but also, to an extent at least, to deflect bullets, fragments of shrapnel and the like. Before the plaintiff developed a type of helmet which he submitted to British authorities for approval the French Army was equipped with helmets, which he had seen, and patents had been granted both by Great Britain and the United States on different types of protective head covering.
The French method of affording head protection in the early stages of the war was by the use of a steel cap inserted between the head and the forage cap, but later there was developed and used the French helmet of thin sheet steel with a buffer lining attached at the brim and with ventilating spaces. The plaintiff in developing a helmet for the use of the British Army used a steel of more resisting power and therefore better adapted for the purpose but nothing is claimed in his patent because of the composition of the metal *48 and we are not concerned with that feature. Neither is the-particular shape of the helmet material for our consideration.
In plaintiff’s British patent for which he made his application on August 16, 1915, he illustrated his invention by five cuts. In his United States patent he illustrated by six cuts, the first five of which, except for an apparently immaterial difference in Figure 4, are the same in both patents, but Figure 6 of the United States patent does not appear in the British patent. However, the plaintiff’s statement is that after about six or eight months helmets like Figure 3 in both patents were abandoned and Figure 6,. appearing only in the United States patent was adopted. Bates are peculiarly absent both as to the time of the adoption of Figure 6 and subsequent modifications which entered into the construction of the British helmet as generally used. Reference to these must be again made.
When plaintiff made his application for a United States patent he stated his claims as set out in Finding III. They were all rejected by the examiner, after which they were cancelled by plaintiff and others substituted. In rejecting the original claims 1, 3, 5, 1, 8, 12, 13, and 14 the Patent Office cited British Patent 11,409, of June 1, 1899, to Towell. The substituted claims bearing the same numbers were like the original except in one respect, and the change in that one respect was common to all. We have here to do with these particular claims except 8. The other claims involved features not here in issue.
Claim 1, for example, was for “A helmet or head shield consisting of a metal shell, a loose buffer lining and detachable means holding the crown of said lining to the crown of' the shell.” In all of these original claims the identic language, “ and detachable means holding the crown of said lining to the crown of the shell,” was used. Substituted claim 1, finally allowed, was for ’’'A helmet or head shield consisting of a metal shell and a loose buffer lining, secured at one point ordy of its crown to the crown of said shell by detachable means.” The substituted phraseology indicated in italics, which are ours, is common to all the claims in question.
*49 The Towell patent cited related to “ an improved cork or pith or like helmet.” It consisted of two shells, an outer and an inner, with a ventilating space between and connected at the crown by a ventilating tube. The two shells are connected at intervals at the sides by distance pieces of cork or other suitable material attached to the outer and inner shells “by solution.” There is a corrugated band between the lower edge of the inner shell and the outer shell, ventilating spaces and a “ head band ” inside the inner shell, which, as illustrated in the patent, it may be said, can not but suggest similarity between it and the British helmet.
In rejecting other claims than those against which Towell alone is cited, the Patent Office cited “ Towell in view of (Br.) Curtis, 19,109, Aug. 16, 1914; Helmets (1 sht.).” Curtis might well have been cited as to features of the claims in suit, but we deem it unnecessary to review it in detail. And this largely because it seems to us more important to consider the conclusion to be drawn from the action of the Patent Office in rejecting the original claims and allowing the substituted ones, and the plaintiff’s statement in that connection, as indicating the scope of plaintiff’s patent.
Attention has already been directed to the difference in the language used in the original and substituted claims. In both instances it has to do with the means of holding the crown of the lining to the crown of the shell. The claims were rejected when they provided for “ detachable means holding the crown of said lining to the crown of said shell,” but they were allowed when they provided that the lining should be “ secured at one point only of its crown to the crown of said shell by detachable means.” Plaintiff in his communication to the Patent Office, set out in Finding III, in which he cancels his original claims and substitutes others, attempts to differentiate his patent from those cited and in doing so repeatedly asserts that the distinctive feature of his invention is a loose lining attached at one point only and easily removable. The only reasonable conclusion is that it was upon this feature of his claim that he asserted his right to a patent and upon which it was granted.
*50 The action of the Patent Office in thus reversing itself upon such an apparently minor change is hardly understandable. It has been suggested that it might have been influenced by humanitarian consideration in connection with the war in view of the statement in the specifications that the invention was designed to facilitate the removal of the shell without removing the lining in case of injury to the skull. If that was an animating influence, which is only a matter of inference predicated on the representation as to advantage in this respect, it does not appear that it was ever so used. It does appear that the removable character of the lining facilitated the installation of new linings when the old were worn out.
But upon this feature it is first to be observed that the prior art was but limitedly cited by the Patent Office. Perhaps the citations were regarded as sufficient for the purpose in the first instance, but other citations might well have been made on final consideration with, possibly, a different result. British patent 9968 of 1905 to Hewerdine related more particularly to head coverings designed for use in hot weather, but it involved an outer shell and an inner frame attached at the crown, although there are other fastenings,, but in one form “ the inner frame is made entirely separate and easily removable,” and in his specifications the applicant says, “ I am aware that the use of an inner lining or head piece detachable from the crown is not of itself new.”
Much more in point is the U. S. Patent No. 557864 of April 7, 1896, to McNamara and Peppier. Why it was not cited by the Patent Office is incomprehensible.
The invention was a miner’s hat for use of men employed in mines “ or similar places ” and designed to provide a hat “ which will withstand a shock of coal, rock, or other material falling thereon.” Plaintiff’s patent is said to “ relate to helmets, or head shields for military, mining, and the like use ” and steel helmets are referred to in his specifications as “ designed to protect the head against wounds caused by the impact of rifle bullets, shrapnel bullets, shell splinters,, falling coal, stones, or minerals and the like.” Both patents-involved an outer shell of metal and a lining attached to a headband and so arranged that there should be a ventilating *51 space between. In McNamara and Peppier the lining was secured at the lower edge or headband by “ curved spring plates.” These springs are the equivalent in all respects of the “ resilient pads ” or “ small buffers or studs of resilient material such as rubber ” in plaintiff’s patent, which are “ for the purpose of providing the required air space or gap between the lining and the shell and for absorbing shocks produced by external impact.” And since they afford the only means of attaching the shell to the lining it is important on the question of removability of lining to note that their attachment to the lining is only by the inclusion of one downward extending member of the spring within a fold of the headband so that the headband may be readily slipped off the spring members and the lining is free. In the specifications it is said “ Furthermore, the lining can, at any time it is deemed desirable, be taken out without ripping any part of the same.”
The loose buffer lining was here present attached to the shell by detachable means which permitted its ready removal. It was not attached at one point only to the crown of the shell but if the one point attachment by detachable means was a feature of plaintiff’s patent, possessing value because facilitating removal it seems clear that the lining was easier of removal in McNamara and Peppier than in Brodie which necessarily involved filing or burring off the head of the rivet. And the use of a rivet as a “ detachable means ” involved no novelty or invention. Neither would it amount to invention to use one rivet when possibly two or even three might have been used before if ordinary mechanical skill dictated the desirability and sufficiency of one instead of more.
There is much more that might be said as to the prior art, but we deem it unnecessary. It seems to us sufficiently established that plaintiff’s patent is invalid for want of novelty or invention.
There are many authorities which might be cited on the question of what constitutes “ invention ” and on the proposition that “ novelty ” is not necessarily invention, but rather than review them we quote a general and comprehensive statement by Mr. Justice Bradley in Atlantic Works v. *52 Brady, 107 U. S. 192 at 199. This case is frequently cited and the opinion sometimes referred to as a “ classic.” He said:
“The process of development in manufactures creates a constant demand for new appliances, which the skill of ordinary head workmen and engineers is generally adequate to devise, and which, indeed, are the natural and proper outgrowth of such development. Each step forward prepares the way for the nest, and each is usually taken by spontaneous trials and attempts in a hundred different places. To grant a single party a monopoly of every slight advance made, except where the exercise of invention, somewhat above ordinary mechanical or engineering skill, is distinctly shown, is unjust in principle and injurious in its consequences.
“The design of the patent laws is to reward those who make some substantial discovery or invention which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accounting for profits made in good faith.”
It is rather startling, in connection with the consideration of this case, to have attention called to an opinion by Judge Westenhaver, of the Northern District of Ohio (American Chain Co. v. Cox Brass Mfg. Co., 292 Fed. 624 at 626), in which, considering the validity of a patent on an automobile bumper, he, by way of illustration, said:
“ Shields, fenders, and devices for purposes of protection are of immemorial antiquity. In the World War, when it was realized that some protection against shrapnel fire would be serviceable, the need was at once answered by the development of the steel helmet. In a commercial sense the steel *53 helmet was new, but in a patentable sense it was not novel nor an invention. No inventive genius was involved, either' in the conception or in the embodiment of it in a practical device.”
If perchance the conclusion reached may be erroneous, and to the end that the case may be fully considered, there is yet the question as to whether the United States used plaintiff’s patent if its validity in any respect is conceded.
Thus far we have not discussed all features of the Brodie helmet. It has seemed unnecessary. Perhaps in comparing-that structure with the helmet made for the United States- and with the British helmet it may be desirable to advert to some features additional to those already discussed, but the-whole field of protective head coverings ordinarily called helmets need not be reviewed. Much of it is of common knowledge of such a character as may not be appropriated by anyone to the exclusion of the public. We can not see any possible basis for a contention that the United States might not without infringing anyone’s rights manufacture a helmet with a steel shell and line it to protect the wearer’s head from the steel, and in accomplishing that purpose to use a loose lining either entirely detached from or attached to the shell, and to provide ventilating space between the shell and lining and to provide a headband attached to and as a part of the lining equipped with buffers between the headband and shell to absorb shock and to attach straps as might be convenient or necessary for holding the helmet on the head. All of this is old, some of it as old as history records. And if this be true we have but by another route-reached the same conclusion as that heretofore derived from a consideration of the action of the patent office and plaintiff’s statements in connection therewith and that conclusion must necessarily be, otherwise stated, that if the plaintiff' had a valid patent at all it was a very narrow one, and the-United States can not be liable for the use of anything outside of the validly patentable features.
Officers of the United States Army, learning during the early stages of the World War that protective helmets were being used by troops on both sides, naturally and properly became interested in the subject. It was the duty of some of *54 them in particular to look after proper equipment for our own troops. We were then neutral and not in position to seek cooperation from either side. First, a helmet like those .used by the French Army was brought over. It was sent to the Bock Island Arsenal with instructions with reference to the development of a helmet for the United States Army. Before much real progress had been made some of the foreign commissions reached the United States bringing with 'them various war exhibits, among which were helmets such -as those worn by the British and German Armies. After conferences on the subject it was concluded to pattern after the British helmet, then in use in the British Army, and, with some changes, this was done.
But it is to be observed that the “ British helmet,” although manufactured for Great Britain by Brodie, the plaintiff, ■•as a contractor, was not necessarily the Brodie helmet of the patent in suit. Brodie was a contractor for the manufacture ■of helmets for Great Britain and as such made them in very large numbers. He was, he says, the “ helmet expert ” of the British War Office. He “ presented ” the British helmet to the British Government free of royalty. When he developed his first type of helmet he submitted it to the British War Office for a test which consisted principally in putting on the helmet and permitting himself to be struck over the head with an iron bar. This naturally tested the resisting qualities of the steel shell and the action of the buffer lining or headband with which we do not seem to be concerned. After this helmet was approved and made in limited quantities for .a short time he made various changes at different times, .approval of which he was not required to secure. The change first made, after six or eight months, was, he testifies, to Figure 6. Figure 6, as already said, appears in the United States patent but not in his British patent. His •explanation as to why he incorporated this in his United States patent but did not include it in a British patent is perhaps not a proper subject for comment. The date when this type of helmet was made and used does not definitely appear in its relation to his procedure in the Patent Office here, but we pass without discussing any questions of that nature arising because we are furnished with exhibits of *55 both the British and. American helmets, and, as we see it, the British helmet, so called, was not in accordance with .Figure 6.
Figure 8 of the patent in suit, which is apparently the ¡same as Figure 3 in plaintiff’s British patent shows the chin strap attached to buckles riveted to the brim of the shell. Figure 6 shows a modification of the attachment of the chin ■straps. The specifications say: “As will be seen from the drawings, the chin strap is passed through one buckle, over the lining, and through the other buckle. The strap is fastened by a rivet at the crown of the helmet.” And it is said this kind of attachment has the advantage that the •lining adjusts itself to the wearer’s head when the strap is pulled around the wearer’s chin. There is no mention of the attachment of the chin strap to the headband or otherwise than to the rivet at the crown of the helmet. The theory apparently was that the pulling down of the shell by the chin strap attached to its crown would serve to seat the lining or headband on the head, and in testimony the strap, in passing from the buckles on each side to the rivet at the crown of the shell is described as pulling in a V shape and clamping the lining to the head. In the specifications it is said that “ the inner protective lining .grips the head firmly and does away with the continued necessity of pressing down the helmet to keep it in place.” If this operation of the chin strap, passing through the buckles and over the lining and attached only at the crown •of the shell, is material, it is to be said that no exhibit helmet which we have before us follows that type of construction. In the exhibit helmet introduced as the British helmet, as well as the helmet stipulated into the record .as the one manufactured for the United States, the chin strap, after passing 'through the buckles on each side, is attached to the headband.
If the first recited construction was amended or in fact not put into practical use and it was modified by the fastening of the chin straps to the headband it must be but reasonable to assume that the helmet as represented by Figure 6 was not practically operative. It is difficult to see how it could have been so without the attachment of the chin *56 strap to the headband to seat the latter and hold it properly to the head. If this feature of the construction is for consideration at all, it is then to be noted that the exhibits-indicate a difference between the construction and operation of the British helmet and that made for the United States. In the British type, while the chin strap is attached to the headband, it is so attached that when tightened under the chin the “ pull ” is upon the rivet at the crown of the shell. In the United States helmet the “ pull ” is upon the headband, and when it is seated the strap passing from the buckles to the crown of the shell is not taut but remains slightly loose, serving to hold the shell, but at the same-time permit slight motion. We are fully aware that there is in evidence a cutaway helmet from which it has been sought to demonstrate that there is nothing in the construction of the United States helmet to interfere with the “ pull ” of the strap on the crown of the shell. This is entirely true so far as the operation of the strap in the-cutaway helmet is concerned, but it does not take into consideration the fact that in the helmet proper there is attached to the headband an adjustable netting which rests upon the top of the head of the wearer, and assuming that the headband is furnished in proper size and the netting properly adjusted to its intended purpose, the “ pull ” is upon the headband properly set to the head, and not upon the crown of the shell.
While these differences have been suggested for what they are worth it would seem that determination of the question as to whether or not the United States used the plaintiff’s patented invention must be in the light of the scope of that invention,. and we have already observed the necessarily narrow construction which must be put upon that invention, if there was invention at all. The phraseology heretofore quoted from the various claims relating to the attachment of the crown of the lining at a single point to the crown of' the shell implies a construction which is not found in the-United States helmet. The whole lining of the shell in plaintiff’s patent is integral, with an attachment at the crown by a rivet, as stated, the strap passing over the lining. The lining in the United States helmet is not so constructed *57 but is .found to be in two parts. There is first a separate ■oval pad of possibly asbestos or some similar material, which is seated in the top of the crown of the shell, attached thereto ;and under which the chin strap passes. The other part of the lining, if it is to be so termed, consists of the headband, to which, at its upper edges is attached the adjustable netting, and this headband and netting constituting the loose and removable lining finds no attachment whatever to the shell at any point. It is attached only to the chin strap at each side above the buckles and may be removed by disengaging the chin strap alone.
But we see no occasion for further discussing this feature of the case. We are confident of the correctness of our conclusions with reference to the invalidity of the plaintiff’s patent. The secondary question has been limitedly discussed simply that the whole case may receive consideration. It is our conclusion that upon either or both of the stated grounds the plaintiff must fail of recovery and that his petition must be dismissed.
Geaham, Judge; Hat, Judge; Booth, Judge; and Campbell, Chief Justice, concur.