**NIPPON HODŌ COMPANY, Ltd.,**

v.

**UNITED STATES.**

**FUIJI SANGYO KABUSHIKI KAISHA**

v.

**UNITED STATES.**

Nos. 479-54, 421-57.

United States Court of Claims.

Jan. 18, 1961.

Rehearing Denied April 7, 1961.

Laramore, J., dissented.
See also 160 F.Supp. 501.

Daniel M. Singer, Washington, D. C., Richard Schifter, Washington, D. C., and Ben Bruce Blakeney, Tokyo, Japan, on the briefs, for plaintiffs.

John R. Franklin and Philip W. Lowry, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., for defendant.

JONES, Chief Judge.

Plaintiffs are Japanese corporations suing the United States on contract claims. In both cases, the defendant sought and was granted a separate trial on the issue of jurisdiction of this court; namely, whether such jurisdiction extends to suits against the United States by citizens of Japan. These cases were consolidated for trial of this mutual jurisdictional issue.

The plaintiffs proved that American citizens, in suits against the Government of Japan, are treated before the courts of Japan no less favorably than Japanese nationals. It is the defendant's main contention, however, that the plaintiffs have failed to prove that an American citizen in Japan could maintain against the Japanese Government the *precise suit* which plaintiffs bring here against the United States, and absent such proof this court is without jurisdiction under section 2502 of Title 28 United States Code.

Section 2502 is as follows:

"Citizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute. claims against their government in its courts may sue the United States in the Court of Claims if the subject matter is otherwise within such court's jurisdiction."

This section was codified in 1948, 62 Stat. 869, 976, but with minor changes it was simply a reenactment of the Act of March 3, 1911, 36 Stat. 1087, 1139, which in turn derived from the Act of July 27, 1868, 15 Stat. 243. The latter provided that no suit was to be maintained by or for an alien against the United States for any action taken under the Acts of 1863 [1]

---

**I.** 12 Stat. 820.

and 1864[2] relating to the seizure of abandoned property in insurrectionary districts. A proviso added:

"That this section shall not be construed so as to deprive aliens who are citizens or subjects of any government which accords to citizens of the United States the right to prosecute claims against such government in its courts, of the privilege of prosecuting claims against the United States in the court of claims, as now provided by law."

It appears that prior to this Act of 1868 aliens could bring suit in the Court of Claims without reference to reciprocal rights of United States citizens to sue in courts of foreign countries. Scharfer v. United States, 4 Ct.Cl. 529; Wagner v. United States, 5 Ct.Cl. 637.

It is apparent from a reading of the original act as well as the jurisdictional statute currently in force that access to this court by aliens is conditioned upon proof of reciprocity—proof that a right is accorded citizens of the United States to prosecute claims against the alien government in the courts of that nation. It is the character of this required return in kind that is here in issue. The defendant contends that the return must be *in specie*.

This question has been before this court on previous occasions. In Brodie v. United States, 62 Ct.Cl. 29, it was contended that a British subject could not sue the United States in this court for patent infringement because an American (and similarly a British subject) could not prosecute such an action against the Crown. In answer to this we stated at page 46:

"The true test is not whether a citizen of the United States may prosecute an action of a particular nature in a British court but whether the doors of British courts are open to American citizens for the prosecution of 'claims' against the Crown, but necessarily only such claims as might be prosecuted by British subjects, for there as here there are classes of action as to which the sovereign has not consented to be sued."

This was our announced construction of the statute in 1948 when the Congress reenacted the provisions without substantial change. Thereafter, in Marcos v. United States, 102 F.Supp. 547, 551, 122 Ct.Cl. 641, 648, a case involving a Philippine national, we restated the same position we had taken in Brodie, as follows:

"The admission of American citizens to the Philippine courts with all of the rights of Philippine citizens as against the Philippine Government satisfies the requirements of Section 2502, and the fact that the consent of the Philippine Government to be sued is more restricted than the consent of the United States Government to be sued, is not controlling. Brodie v. United States, 62 Ct.Cl. 29, 46; cf. United States v. O'Keefe, 11 Wall. 178, 20 L.Ed. 131."

█ The defendant continues to urge upon us its concept of reciprocity, a concept which demands that we do unto others precisely as they do unto us—*and no more*. Such a position, if accepted, would add no luster to the golden rule of conduct that long has guided our country in its international affairs. Furthermore, we doubt that it is in harmony with the attitude of Americans everywhere that their country is strong, generous, and willing to lead and act first. The Congress has provided that this court shall be open to any aliens whose government "accords to citizens of the United States the right to prosecute *claims* against their government in its courts." [Emphasis supplied.] We do not read "claims" to mean "claims of the precise nature brought before this court." The section contemplates only that American citizens enjoy an equal standing with foreigners in actions against the foreign State and does not require that the scope of actions for which the respective coun-

2. 13 Stat. 375.

tries render themselves liable to suit shall be coextensively identical and *in pari materia*.

Perhaps there is some minimum amount of sovereign-liability in his own country which must be proved by an alien wishing to sue our Government in this court. We would carefully measure the scope of our jurisdiction in a situation where a rule in a foreign law book permits Americans free access to the courts but where it appears in practice that Americans are barred from the courts. The case before us does not present these difficulties. The plaintiffs have adequately proved that the Japanese open their courts to Americans in a multitude of causes against the Japanese Government, including, according to most authorities, suits for breach of contract.

The plaintiffs produced a deposition from a Japanese attorney, an experienced member of the Tokyo Bar Association, stating in unequivocal language that an American shared equally with a Japanese citizen "the right to sue the Japanese State for breach of Contract." This statement was affirmed by the Director of Litigation of the Japanese Ministry of Justice. Furthermore, in three separate inquiries our State Department sought to ascertain the status of American citizens before the courts of Japan. The replies from the Japanese Ministers of Foreign Affairs were as follows:

"Citizens of the United States are given the right equally with the Japanese subjects to institute actions in Japanese courts against the Japanese Government in regard to claims arising from such legal relations between the citizens of the United States and the Japanese Government as belong to the domain of private law.[3]

"[T]he separateness of the courts of administrative law results in fact in few and unimportant suits against the Japanese Government whatever may be the statements in the codes with regard to the liability of the government to suits.

"In civil cases the Japanese Government occupies a co-ordinate position before legal courts with Japanese subjects \* \* \*. However, except in special instances which belong to the jurisdiction of the ordinary courts, legal matters concerning public law become questions for administrative litigation.[4]

"Contractual actions against the Japanese Government may be brought by both alien and Japanese nationals pursuant to general provisions of the Japanese civil and commercial codes.[5] "

The plaintiffs did fail to submit translations of any Japanese cases in which the State was sued for breach of contract. Little weight can be given to this omission when it is considered that we are dealing here not only with a different legal system but a different culture as well. Formal legal standards play a far less pervasive role in Japan in the creation and adjusting of principles regulating conduct than they play in the West. American scholars have repeatedly noted the amazing lack of litigation in Japan and the striking persistence in Japanese society of forms of dispute-resolution other than law.[6] Those disputes involving public law which do arise are usually settled in administrative tribunals other than courts. The few court decisions available have only in recent years included a full statement of the facts in the published accounts.[7]

The defendant has further emphasized that while the Japanese codes and statutes provide in some ways for suits against the Government, they fail to provide specifically for suits for breach of contract. We think the defendant has assumed too much, and has again over-

---

3. Dept. of State File, 811.0433/51 (1925).

4. Dept. of State File, 894.0433/4 (1938).

5. Dept. of State File, 194.3322/7–31 (1959).

6. Blakemore, Post War Developments in Japanese Law, 1947 Wis.L.Rev. 632.

7. von Mehren, Some Reflections on Japanese Law, 71 Harv.L.Rev. 1486.

looked the fact that the Japanese have accepted a system of jurisprudence whose tenets and history are different from those of our own. English common law started with the historic maxim that the "King can do no wrong," and the further proposition that the sovereign was immune from suit. "The King," reads a famous passage from Blackstone, "is not only incapable of doing wrong, but even of thinking wrong; he can never mean to do an improper thing; in him is no folly or weakness." [8] This theory of state infallibility and immunity was incorporated into the jurisprudence of American democracy even though we had no King; the Chief of State was never sovereign. From the beginning sovereign power resided in the people, and the rights of individuals against the State were fundamental among our earliest legal principles.

While no one would question that for many years our law restrained suits against the Government, the responsibility of this position never went without challenge. "It is not too much to say," wrote an English observer, "that the whole Constitution has been erected upon the assumption that the King not only is capable of doing wrong, but is more likely to do wrong than other men if he is given a chance." [9] Mr. Justice Frankfurter has asserted that whatever the ancient bases for the rule of immunity, "it undoubtedly runs counter to modern democratic notions of the moral responsibility of the State." Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 59, 64 S.Ct. 873, 879, 88 L.Ed. 1121 (dissenting opinion).

Today we know that our Government may be sued on a multitude of causes. Nevertheless, the doctrine of sovereign immunity has never been expressly repudiated by an American court. In our country the creation of State responsibility has been solely the result of legislation.

Civil law countries, on the other hand, particularly France, early in the development of their law, rejected both the concept that the King can do no wrong and the accompanying doctrine of sovereign immunity. These countries took the position instead that "the State is an honest man" and as such it will seek to repair damages caused by its wrongful acts. History shows that from this basic civil law premise the full development of state liability in these countries has been the handiwork of the judges and the courts.[10]

Japanese law today is not the product of centuries of slow, organic growth; it did not develop along with, and as a part of, the whole society and culture. Less than a century ago the Japanese took their law bodily from the systems of continental Europe. The Japanese Civil Code is truthfully called the "fruit of comparative jurisprudence." [11] The drafters surveyed the French, Swiss, and particularly the German civil codes and adopted from them broad teachings but no specific rules as to state responsibility. The multitude of European cases was examined but discarded. The result is a paradox: state liability in Japan is a commonly accepted fact but its proof by statutes and cases is difficult.

With this brief background, it is easier to understand and accept the statement of plaintiffs' deponent—"I have never known . of any question being raised whether the citizen can sue the State. * * * Since it is the general opinion of the Japanese Bar that a citizen may bring an action against the State, equally for breach of contract, for payment of salary or damages of other kinds".

Both parties have briefed and argued the application and effect of the 1953 Treaty of Friendship, Commerce and Navigation between the United States of America and Japan, 4 U.S. Treaties 2063. We believe the proper disposition of this

---

8. 1 Blackstone's Commentaries 254 (1813 ed.).

9. Herbert, Uncommon Law 292 (1935).

10. Schwartz, French Administrative Law and the Common Law World 270 (1954).

11. Hozumi, The New Japanese Civil Code as Material for the Study of Comparative Jurisprudence 11 (1904).

case does not require us to reach the issues thereby presented.

■ The court concludes as a matter of law that the plaintiffs are entitled to maintain their suits in this court pursuant to 28 U.S.C. § 2502, and the cases are returned to the trial commissioner with instructions to proceed with the remaining issues of law and fact, as previously directed.

It is so ordered.

DURFEE, MADDEN and WHITAKER, Judges, concur.

LARAMORE, Judge (dissenting).

I cannot agree with the majority for these reasons: The Treaty of Friendship entered into between the United States and Japan puts access to the courts on a reciprocal basis. Section 1 of Article IV of the Treaty provides that "nationals * * * of either party shall be accorded national treatment * * * with respect to access to the courts * * *."

National treatment is defined in section 1 of Article XXII of the Treaty as follows:

"The term 'national treatment' means treatment accorded within the territories of a party upon terms no less favorable than the treatment accorded therein, in like situations, to nationals, companies, * * *, as the case may be, of such party."

This, it seems to me, must mean that each government shall give equal treatment to the other with respect to access to the respective courts. As a matter of fact, this would appear to be in complete harmony with the primary purpose of the statute which permits a foreign citizen or corporation to sue the United States in cases wherein a foreign government accords to citizens of the United States the right to prosecute claims against their government in its courts. In other words, "equal treatment" would seem to be the controlling factor in both the Treaty and the statute.

Under these circumstances, the burden would be on the plaintiffs to prove that a citizen of the United States could prosecute a claim for breach of contract against the Japanese Government. This, in my opinion, the plaintiffs have failed to do. No statute or article of the constitution of Japan has been put in evidence from which this court could conclusively find a provision for suits in breach of contract. On the contrary, the constitution of Japan quite clearly shows that only suits in tort are cognizable by the courts of Japan.

Consequently, I would hold that section 2502 requires that United States citizens have the right to sue the Japanese Government in contract in its courts as a condition to maintenance of plaintiffs' suits in contract in this court. Otherwise, a Japanese citizen would have greater rights in the United States courts than those accorded them in their own country.

I would overrule the Brodie and Marcos cases cited in the majority opinion to the extent that they are in conflict with my views.