CLEVENGER, Circuit Judge.
 

 This suit was brought in the United States Court of Federal Claims by Cuban nationals seeking payment of pension benefits from the United States government. The complaint alleges that the plaintiffs are former military personnel, or the surviving spouses of former military personnel, who served in various branches of the United States armed forces during World War II, and therefore, are entitled to participate in the Civil Service Retirement System. The Court of Federal Claims dismissed the plaintiffs’ action for want of jurisdiction, holding that it did not have subject matter jurisdiction over their complaint pursuant to 28 U.S.C. § 2502(a) (the “Reciprocity Act”) even if they were entitled to payment.
 
 Ferreiro v. United States,
 
 54 Fed. Cl. 274, 281 (2002). The Reciprocity Act limits the jurisdiction of the Court of Federal Claims over suits brought by aliens against the United States to those suits in which the alien’s home country “accords to citizens of the United States the right to prosecute claims against their government in its courts.” 28 U.S.C. § 2502(a) (2000). For the reasons set forth below, we vacate the judgment of the Court of Federal Claims dismissing the complaint and remand the case for a more complete assessment of whether the plaintiffs have satisfied the requirements of the Reciprocity Act.
 

 I
 

 The Reciprocity Act stands to assure foreign nationals of their right to sue the United States when their home courts do not discriminate against United States citizens by precluding United States citizens from bringing suits against the foreign government in its own courts. The Reciprocity Act is virtually ancient, having been enacted by the 40th Congress in 1868. Act of July 27, 1868, § 2, 15 Stat. 248. The Reciprocity Act appeared in its initial form as a proviso to a law that barred aliens from bringing suits against the United States to recover property in insurrectionary districts that the government had seized pursuant to certain Civil War era enactments.
 
 See Nippon Hodo Co. v. United States,
 
 152 Ct.Cl. 190, 285 F.2d 766, 766-67 (1961) (discussing legislative history of the Reciprocity Act). At the time, the proviso stated that the law would:
 

 not be construed so as to deprive aliens who are citizens or subjects of any government which accords to citizens of the United States the right to prosecute claims against such government in its courts, of the privilege of prosecuting claims against the United States in the court of claims, as now provided by law.
 

 
 *1269
 
 Act of July 27, 1868, § 2, 15 Stat. at 243. The Act of March 3, 1911, contained a similar provision which read:
 

 Aliens who are citizens or subjects of any government which accords to citizens of the United States the right to prosecute claims against such government in its courts, shall have the privilege of prosecuting claims against the United States in the Court of Claims, whereof such court, by reason of their subject matter and character, might take jurisdiction.
 

 36 Stat. 1087, 1139. The modern Reciprocity Act was codified as 28 U.S.C. § 2502 in 1948 and states:
 

 Citizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the Court of Claims if the subject matter of the suit is otherwise within such court’s jurisdiction.
 

 In 1992, the language of the Reciprocity Act was changed to replace “Court of Claims” with the name of its successor court, the “United States Court of Federal Claims.” Federal Courts Administration Act of 1992, Pub.L. No. 102-572, § 902(a)(1), 106 Stat. 4506, 4516 (1992).
 

 The Reciprocity Act has been interpreted on a number of occasions. Two years after its enactment, the Supreme Court considered whether a British subject could maintain a suit in the Court of Claims to recover compensation for abandoned cotton that had been captured by the United States.
 
 United States v. O’Keefe,
 
 11 Wall. 178, 78 U.S. 178, 179, 20 L.Ed. 131 (1870). The government argued that reciprocity between the United States and the United Kingdom did not lie because British subjects could only bring suits against the Crown at the discretion of the King whereas the initiation of suits in the Court of Claims was not subject to the permission of the President.
 
 Id.
 
 at 182. The Court explained that English common law required an aggrieved British subject to first bring a “petition of right” in order to sue the Crown and that such petitions were denied only in extraordinary cases.
 
 Id.
 
 at 183-84. The Court conceded that there could be instances where the Crown might deny a petition of right on account of political considerations, but concluded, nevertheless, that “[i]t would be a severe rule of interpretation that would exclude all British subjects from the Court of Claims, because in a few sporadic eases, from motives of state policy, the petition of right was denied.”
 
 Id.
 
 at 184.
 

 So long as United States citizens could bring petitions of right, which the record indicated was the case, the King’s power to deny the petition did not automatically defeat a claim of reciprocity. Reciprocity only required the Crown to give United States citizens the right to file petitions of right just as it did British subjects. It did not require parity between the procedures provided by the American and British systems to press grievances against the sovereign.
 

 In
 
 Brodie v. United States,
 
 62 Ct.Cl. 29, 45-46 (1926), the Court of Claims considered whether a British subject could maintain a suit against the United States for patent infringement even though a United States citizen could not bring a like suit against the Crown under the laws of Great Britain. The court stated that barring the plaintiffs suit would require “too narrow a construction” of the Reciprocity Act and concluded that reciprocity was not automatically defeated simply because the Crown had not waived immunity for patent infringement.
 
 Id.
 
 at 46. The court held the plaintiff had standing to sue the United States because British subjects and American citizens shared equally in the
 
 *1270
 
 disability under the British system and the doors of the British courts were open to American citizens for the prosecution of other claims against the Crown.
 
 Id.
 

 In subsequent cases, the Court of Claims reinforced the concept that reciprocity only requires equal treatment. That court stated:
 

 The admission of American citizens to the Philippine courts with all of the rights of Philippine citizens as against the Philippine Government satisfies the requirements of Section 2502, and the fact that the consent of the Philippine Government to be sued is more restricted than the consent of the United States Government to be sued, is not controlling.
 

 Marcos v. United States,
 
 122 Ct.Cl. 641, 102 F.Supp. 547, 551 (1952),
 
 overruled on other grounds by Compania Maritima v. United States,
 
 136 Ct.Cl. 697, 145 F.Supp. 935, 936-40 (1956). In
 
 Nippon Hodo,
 
 the Court of Claims held that the Reciprocity Act “contemplates only that American citizens enjoy an equal standing with foreigners in actions against the foreign State” and does not require the existence of an action against the foreign state of identical nature or scope. 285 F.2d at 767-68.
 

 Finally, in
 
 Zalcmanis v. United States,
 
 146 Ct.Cl. 254, 173 F.Supp. 355, 357 (1959), the court found reciprocity between the government of the Republic of Latvia in exile and the United States even though the former country did not maintain courts, but rather, determined administratively claims against the state. The court noted that the Republic of Latvia, which had been invaded by forces of the U.S.S.R., was still recognized by the United States and the two countries had concluded a treaty prior to the invasion permitting American citizens free access to Latvian courts.
 
 Id.
 
 It concluded that it would be a “harsh construction of section 2502” to deny Latvian citizens access to the Court of Claims simply because the state of affairs required all claims brought against the Latvian government, including those brought by American citizens, to be adjudicated administratively.
 
 Id.
 
 The court added that such a construction would also deny the force of a continuing international agreement between the two countries.
 
 Id.
 

 Thus, precedent cautions, if not compels, us to refrain from interpreting the Reciprocity Act rigidly in circumstances where there is evidence that United States citizens may prosecute claims in the home courts of a foreign national seeking to redress grievances against the United States in the Court of Federal Claims. Equal treatment is the paramount requirement of the Reciprocity Act. Reciprocity is not defeated by a modicum of political interference from the foreign sovereign, by the differing extent to which a foreign sovereign has waived immunity from suit, or even by the nonexistence of a court system in the foreign country. Reciprocity will lie between the United States and a foreign nation so long as American citizens may sue the foreign sovereign on the same terms as native citizens.
 

 II
 

 With this background in mind, we turn now to the merits of this appeal. The plaintiffs maintain they were receiving retirement annuity checks from the government when they each received similar letters from the United States Department of the Treasury (“Treasury”) in 1963 indicating it had:
 

 determined that there is no reasonable assurance that a payee living in Cuba will actually receive United States Government checks or be able to negotiate them for full value. Therefore, since the
 
 *1271
 
 United States Treasury Department Regulations now prohibit payments to persons residing in -Cuba, Civil Service annuity payments are being, suspended. This stoppage of payments applies to all Civil Service annuitants and survivor-annuitants residing in Cuba including those whose Civil Service annuity checks were being delivered to an address outside Cuba.
 

 (J.A. at 37.) The plaintiffs maintain that they have not received annuity payments since 1963.
 
 [1]
 
 "
 

 The regulations the letter referenced are the Cuban Asset Control Regulations, promulgated by Treasury as 31 C.F.R. pt. 515 (1963), pursuant to the United States policy of economic embargo against the Cuban government.
 
 See Regan v. Wald,
 
 468 U.S. 222, 225-26, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984) (discussing genesis of the regulations). They were devised in order to frustrate the Cuban government’s attempts to destabilize governments throughout Latin America by, inter alia, prohibiting transactions involving property in which Cuba or Cubans have an interest.
 
 Id.
 
 at 226-27, 104 S.Ct. 3026. The prohibited transactions include those between Cuban nationals and the United States government.
 
 See
 
 31 C.F.R. § 515.205(j) (persons subject to the prohibitions of the regulations include the United States).
 

 The plaintiffs filed a complaint in the Court of Federal Claims on November 2, 2000, naming the Secretary of the Treasury and others as defendants in which they claimed, inter alia, that they and others similarly situated are entitled to payment of blocked civil service annuities from the United States. The government moved to dismiss on a number of grounds that included the plaintiffs’ alleged failure to satisfy the reciprocity requirement of 28 U.S.C. § 2502(a). In order to demonstrate reciprocity between Cuba and the United States, the plaintiffs submitted an affidavit of one Jorge Cobas. Mr. Cobas maintained that he was a licensed attorney in Cuba who represented citizens of the United States in actions against the Cuban government. He stated that “a Citizen of any country, including those of the United States, has the ability to seek judicial relief in a Cuban court, even if the claim is against the Republic of Cuba.” (J.A. at 41.) Mr. Cobas also observed that “from time to time the Cuban Government and the Communist Party have enjoyed some influence in judicial proceedings.” (J.A. at 42.)
 

 The court deemed it necessary to obtain an official statement from the United States Department of State (“State Department”) in order- to resolve the reciprocity issue. On June 14, 2002, it ordered counsel for the government:
 

 to
 
 obtain
 
 from the United States Department of State a written, official statement directly addressing the issue of whether the Cuban government, in fact, accords United States citizens the right to fully prosecute claims against the Cuban government in Cuban courts.
 

 Ferreiro v. United States,
 
 No. 00-648C (Fed.Cl. June 14, 2002) (order directing counsel to obtain and file official statement from State Department) (emphasis in original). The record does not indicate whether counsel for the United States provided
 
 *1272
 
 the State Department with further guidance on the legal tests for reciprocity under the Reciprocity Act and our precedent. On October 15, 2002, the State Department issued an opinion that counsel for the government filed on the same day. The court subsequently dismissed the plaintiffs’ case for lack of jurisdiction without considering the merits of their claim of entitlement and entered judgment for the United States.
 

 The court’s decision rested entirely on the State Department’s conclusion that
 

 any right of a U.S. citizen to pursue a claim against the Cuban government in Cuban courts is subject to the political interference of the Cuban government and, thus, that there are serious impediments to the ability of a U.S. citizen to pursue effectively a lawsuit against the Cuban government.
 

 (J.A. at 18.) The court characterized the parties’ other evidence on the reciprocity issue as “totally inadequate to effectively answer the question of whether reciprocity exists.”
 
 Ferreiro,
 
 54 Fed.Cl. at 281. The court decided it would rely instead solely on the State Department opinion and declined to hold an evidentiary hearing on the parties’ proffered evidence of reciprocity which the court characterized as “piecemeal, disjointed, and wholly inadequate.”
 
 Id.
 

 The plaintiffs filed a motion for reconsideration in which they noted that they had unsuccessfully moved the court for an evidentiary hearing several times and that the government itself had requested an opportunity to depose Mr. Cobas prior to the court’s final judgment. They indicated the court’s judgment was “unexpected” and asked the court to permit them to introduce evidence intended to corroborate Mr. Cobas’ statements and otherwise prove the existence of reciprocity between Cuba and the United States. The court denied the motion for reconsideration and the plaintiffs timely appealed to this court. We have jurisdiction to hear an appeal of a final judgment of the Court of Federal Claims pursuant to 28 U.S.C. § 1295(a)(3).
 

 Ill
 

 A
 

 We review legal decisions of the Court of Federal Claims without deference and review its factual findings for clear error.
 
 Barrett Ref. Corp. v. United States,
 
 242 F.3d 1055, 1058 (Fed.Cir.2001);
 
 Alger v. United States,
 
 741 F.2d 391, 393 (Fed. Cir.1984). A decision by the Court of Federal Claims to dismiss for lack of subject matter jurisdiction is a legal decision that we review de novo.
 
 Moyer v. United States,
 
 190 F.3d 1314, 1317-18 (Fed.Cir. 1999). A trial court may weigh relevant evidence when it considers a motion to dismiss that challenges the truth of jurisdictional facts alleged in a complaint (here, the appellants’ assertion of reciprocity).
 
 See id.
 
 at 1318 (reviewing fact-finding of Court of Federal Claims on decision to dismiss for lack of subject matter jurisdiction);
 
 see also Reynolds v. Army Air Force Exch. Serv.,
 
 846 F.2d 746, 747 (Fed. Cir.1988) (reviewing jurisdictional fact-finding of district court on motion to dismiss). We review determinations of the Court of Federal Claims regarding jurisdictional facts for clear error.
 
 Hamlet v. United States,
 
 873 F.2d 1414, 1416 (Fed. Cir.1989). However, the legal effect of any particular fact on the ultimate question of jurisdiction is determined
 
 de novo. N. Am. Philips Corp. v. Am. Vending Sales, Inc.,
 
 35 F.3d 1576, 1578 (Fed.Cir. 1994). A jurisdictional fact is clearly erroneous when “there is evidence to support it, [but] the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been commit
 
 *1273
 
 ted.”
 
 United States v. U.S. Gypsum Co.,
 
 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948);
 
 Barrett Refining,
 
 242 F.3d at 1058-59.
 

 B
 

 It appears from the record, and its opinion, that the State Department was not asked to put its conclusions within the framework of legal tests for reciprocity that precedent long provided. For example, the State Department opinion does not discuss whether Cuban citizens can sue their government in Cuban courts, and if so, what conditions, if any, are placed on such suits. This inquiry is of course relevant to deciding the reciprocity issue in this case. The opinion dwells at some length on what the State Department perceives to be the burdens on United States citizens who sue in Cuban courts. Again, its opinion does not focus on whether such risks to United States litigants in Cuba are the same risks that visit Cuban citizens when they sue their government in the home court.
 

 While the State Department opinion documents generalized and specific instances of anti-American animus on the part of the Cuban government, at most, it does no more than assert the possibility of adverse political influence of Cuban government and the Communist Party on proceedings against the Cuban government initiated by United States citizens. We are unpersuaded that, taken alone, the opinion suffices to defeat the plaintiffs’ claim of reciprocity.
 

 The State Department opinion concedes that “it appears that at least some Cuban courts have jurisdiction to hear a claim against the Cuban government brought by any individual (including U.S. citizens).” (J.A. at 19.) Nonetheless, the opinion concluded that the judicial climate in Cuba failed to satisfy the requirements of the Reciprocity Act because pervasive official influence over the Cuban judiciary results in “serious impediments to the ability of a U.S. citizen to pursue effectively a lawsuit against the Cuban government.” That conclusion, even on its own terms, is not enough to support a finding of no reciprocity between Cuba and the United States. Nowhere in the State Department opinion is there any indication that Cuban citizens are exempted from the political interference the Cuban government is purported to wield to the detriment of American citizens. We believe such a finding was critical if the court was to rest dismissal of the. plaintiffs’ complaint under the Reciprocity Act solely on the basis of the State Department’s opinion. As our precedent demonstrates, so long as Cuban as well as American citizens share equally in the specter of political influence in proceedings brought against the Cuban government, reciprocity can nevertheless be found to exist if the Cuban courts are open to United States citizens.
 
 See Marcos,
 
 102 F.Supp. at 551 (“The admission of American citizens to the Philippine courts with all of the rights of Philippine citizens as against the Philippine Government satisfies the requirements of Section 2502.”);
 
 Brodie,
 
 62 Ct.Cl. at 46 (“The true test is ... whether the doors of British courts are open to American citizens for the prosecution of ‘claims’ against the Crown.”).
 

 Furthermore, political interference alone on the part of the foreign sovereign will not serve to defeat a claim of reciprocity. This much has been clear since 1870, when the Supreme Court recognized in
 
 O’Keefe
 
 that a foreign sovereign might, from time to time, find need to engage in discriminatory action towards American litigants that would otherwise undermine the reciprocity requirement. Dismissal under the Act is appropriate when the entire evidence demonstrates the
 
 *1274
 
 foreign sovereign discriminates against American citizens when it delimits the nature and scope of its liability to private parties. Where a naked assertion of political interference is the sole ground for finding no reciprocity, dismissal is unfounded.
 

 The ultimate conclusion of the State Department opinion is grounded on little more than an assertion of political interference. The document observes that Cuban lawyers are under the same pressures as Cuban judges to refrain from acting against the interests of their government, and consequently, are deterred from rendering favorable assistance to American citizens. It also states there are some $6.3 billion in outstanding claims for compensation against the Cuban government for property it has appropriated from the United States and its citizens since the administration of Fidel Castro came to power in 1959. The document also recounts the summary criminal prosecution and execution of two Americans in the early 1960s and asserts that animosity of the Cuban government towards American citizens has been continuing for the last 40 years.
 

 While this evidence reveals a Cuban judicial system that may not be very fair, it does not, in and of itself, buttress a finding of no reciprocity. Absent additional findings that Cuban citizens are excused from shouldering the aforementioned disabilities along with American citizens, the State Department opinion cannot, as a matter of law, serve as the sole basis for the lower court’s dismissal. For example, the State Department opinion does not indicate whether or not the Cuban system offers the same disincentives to Cuban lawyers to file claims against the Cuban government when their clients are Cuban nationals. It is impossible to discern whether it is the client’s nationality or the nature of the suit, i.e., that it is directed at the government, or some combination of the two, that gives rise to interference from the Cuban government. Similarly, there is no discussion of the Cuban government’s treatment of claims for compensation brought by Cuban citizens to recover compensation for government-appropriated property. More was required under the Act to support the State Department’s determination of no reciprocity.
 

 IV
 

 The Court of Federal Claims dismissed the complaint in this suit because it relied on the State Department’s conclusion that political interference by the Cuban government impedes the ability of a United States citizen to pursue effectively a lawsuit against the Cuban government. When the courts of a foreign nation are open to United States citizens, as appears to be the case in Cuba, the first question is not whether the political atmosphere and regime there impairs the ability of a United States citizen to obtain effective vindication of rights against the sovereign. Rather, the first question is whether or not United States citizens are treated differently from citizens of the foreign country in the foreign court when suit is brought against the sovereign. As precedent demonstrates, political oversight of foreign courts does not automatically undermine a finding of reciprocity under the Reciprocity Act. Nor does the fact that a foreign sovereign has not consented to the same types of suits as are permitted in this country against the United States. The treatment of Americans in a foreign nation’s courts must be measured against the long-standing legal tests for reciprocity.
 

 The State Department did not assess the judicial climate in Cuba in light of the governing law, nor did the Court of Federal Claims when it accepted the conclusion of the State Department without question.
 

 
 *1275
 
 V
 

 Given our conclusion that the State Department opinion alone does not work to foreclose definitively the plaintiffs’ access to the Court of Federal Claims, we vacate the judgment of the Court of Federal Claims and remand the case for further fact-finding on the reciprocity issue consistent with this opinion. Specifically, the Court of Federal Claims must reopen the record and hold an evidentiary hearing in which the sufficiency of all the evidence on the reciprocity issue is tested against the legal requirements for establishing reciprocity under the Reciprocity Act.
 

 Before this court, the United States reasserts the additional jurisdictional impediments to the plaintiffs’ suit that it raised in its motion to dismiss. The Court of Federal Claims did not rule on those grounds and we decline to rule on them in the first instance on appeal. If on remand it is determined that the Reciprocity Act no longer stands in the way of this suit, the court will have ample occasion to entertain the additional grounds upon which the government perceives jurisdictional impediments to the present action.
 

 COSTS
 

 No costs.
 

 VACATED AND REMANDED.
 

 [1]
 

 . Since this suit began, the Department of the Navy has asked the Secretary of the Treasury to issue annuity checks to Cuban nationals who retired from employment on the United States military base in Guantánamo Bay, Cuba. This action does not affect plaintiff Mario Vazquez-Lopez who contends in plaintiffs’ second amended complaint thát he served in the merchant marine during World War II. Whether subsequent action by the government favorable to other plaintiffs has mooted their individual complaints is a matter that can be explored on remand by the Court of Federal Claims.