**EGYPTIAN AMERICAN BANK, S.A.E., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 627–85C.

United States Claims Court.

Sept. 28, 1987.

William G. Schaefer, Washington, D.C., for plaintiff; Elaine L. Johnston, of counsel.

Helene M. Goldberg, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

FUTEY, Judge.

This case is before the court on cross-motions for summary judgment. Plaintiff, Egyptian American Bank (Bank), organized under the laws of Egypt and located in Cairo, seeks judgment in the amount of $2,759,980, plus interest, based on the alleged wrongful retention by defendant of funds paid to the Department of State (Department), Office of Foreign Buildings Operations (FBO), pursuant to a bond obligation. Defendant seeks dismissal of plaintiff's complaint and judgment in the amount of $88,000, plus interest, in its counterclaim based on the alleged wrongful retention by plaintiff of funds owed defendant under a letter of guarantee. For the reasons discussed hereinafter, plaintiff's motion is denied while defendant's motion is granted in part and denied in part.

## FACTS

Defendant, acting through the Department of State, Office of Foreign Buildings Operations, contracted on November 3, 1982, with Kramico, S.A.E. (Kramico), an Egyptian construction firm, for the building of a new United States Embassy office building in Cairo, Egypt. As originally drafted this contract, FBO Contract No. 3416–231001, provided for completion of the project in 38 months at a price of $27,599,791. Article 2(a) of the contract provided that:

The Contractor shall furnish the Government, from reliable surety(ies) within thirty (30) calendar days after the execution of this contract, a performance and a payment bond, each in the amount of 15 percent of the contract price.

This percentage was reduced in the Supplementary General Conditions to 10 percent of the contract price.

By letter dated November 6, 1982, Kramico advised the Bank of the above contract and requested plaintiff to issue the financial instruments called for therein. The pertinent language reads as follows: "The letter of guarantee may please be issued in your standard form and the Performance Bond issued in U.S. Government Standard Form DS 1167. A copy of the contract agreement and DS 1167 are enclosed."

Pursuant to this letter the Bank issued a "LETTER OF GUARANTEE NO. 82/6848 ADVANCE PAYMENT" to the Department in the amount of $2,200,000 on November 10, 1982. This instrument, as amended on November 11 and December 6, 1982, secured the repayment of an advance payment extended to Kramico by the Government and reads, in pertinent part, as follows:

WE, EGYPTIAN AMERICAN BANK, ZAMALEK, CAIRO, hereby irrevocably and unconditionally guarantee the amount of U.S. $2,200,000.00 [and] undertake to pay to you on your first demand in writing to us any amount you may ask, but not exceeding the amount of our guarantee, notwithstanding any contestation of the contractor or any other party.

The letter of guarantee set forth a repayment schedule whereby Kramico was to repay the foregoing sum by means of $88,000 deductions from 25 consecutive progress payments. As to the method of repayment, the instrument provided:

The amount of this Letter of Guarantee will be reduced upon presentation of Contract Estimates, Form DS–379a, signed by the Government's Project Manager certifying partial repayments of the advance payment in conjunction with progress payments in accordance with the contract, or as otherwise certified by the Government's Project Manager in writing.

On November 11, 1982, the Bank issued a second financial instrument to the Department in the amount of $2,759,980. Instead of using the Government's standard form DS 1167 for performance bonds, however, the Bank used its own printed form entitled "LETTER OF GUARANTEE NO. (82/6849)," beneath which the caption "PERFORMANCE BOND" was typed in. The printed form contains a clause reading "in connection with," after which the following language was typed: "THE PERFORMANCE BOND FOR THE CONSTRUCTION OF NEW EMBASSY OFFICE BUILDING TOWER & RELATED WORK ON EMBASSY COMPOUNDS, AS PER CONTRACT AGREEMENT NO. 3416–231001 DATED NOV. 3, 1982." Underneath this entry the printed form states: "We agree to pay you this amount on your first demand, notwithstanding any contestation from the above-named (Kramico)." The Department accepted the Bank's instrument in lieu of the standard government form.

Kramico began work on the project in early 1983. By letter dated November 27, 1984, however, the Department expressed concern to Kramico about the progress of construction and requested certain information about financing and scheduling. A more detailed letter was sent to Kramico on December 28, 1984, in which the Department requested specifics regarding Kramico's financing, scheduling for the duration of the contract, and arrangements with subcontractors. The letter advised Kramico that if it failed to satisfy the requirements set forth therein by January 10, 1985, the construction contract would be terminated for default. Although Kramico did respond in writing on the above date, the Department adjudged the response unsatisfactory and, by letter dated January 13, 1985, informed Kramico that the construction contract was terminated.

On that same date, January 13, 1985, the Department's Project Manager for the Cairo embassy construction, Mr. Joseph Toussaint, hand-delivered a letter on behalf of the Deputy Assistant Secretary for Foreign Buildings (the contracting officer) to Dr. Farid Saad, Vice Chairman of the Egyptian American Bank, demanding "payment of the letters of guarantee No. 82/6848 for the amount of U.S. $440,000 and No. 82/6849 for the amount of U.S. $2,759,-980." The $440,000 represented the sum allegedly not yet repaid by Kramico against the advance payment made by the Government at the outset of the project. Mr. Toussaint was advised to return to the Bank the following morning to receive payment. When he did so he was delivered two checks in the amounts of $352,000 and $2,759,980.

Mr. Toussaint questioned Dr. Saad about the discrepancy in the amount of payment on Letter of Guarantee No. 82/6848. Dr. Saad took the position that the difference of $88,000 between the amount demanded and the amount paid was justified by the issuance of the Government's Contract Estimate No. 23 on November 20–21, 1984. This Estimate showed a balance due to Kramico (after deduction of the requisite $88,000 advance repayment deduction) of $36,697.20 for the period of October 2 through November 6, 1984. Based on this Contract Estimate, the outstanding balance of Kramico's advance payment (and the Bank's obligation on Letter of Guarantee No. 82/6848) would have been reduced to $352,000.

The Government's demand for $440,000 was based on a revised Estimate No. 23, which was issued December 23, 1984. At approximately the same time the original Estimate No. 23 was issued, Mr. Toussaint sent a letter to Kramico, dated November 20, 1984, advising that the Department had received information from the Egyptian Social Insurance authorities concerning amounts owed by Kramico and directing that Kramico furnish detailed information. These and other additional debts of Kramico were listed in the revised Estimate No. 23, which covered the period of October 2 through December 23, 1984. The additional deductions left insufficient earnings for an advance repayment deduction and no balance due. Thus Kramico received no progress payment on either Estimate No. 23 or revised Estimate No. 23. The Government took the position that because

the above Estimates did not result in any payment to Kramico, they did not reduce the outstanding balance under Letter of Guarantee No. 82/6848, which was $440,-000 after Contract Estimate No. 22 and under revised Estimate No. 23.

On January 20, 1985, the Bank submitted to the Department a Memorandum of Understanding, co-signed by representatives of Kramico, a construction business consortium called the Kettaneh Group, and the Misr Iran Development Bank, outlining various alternatives for completion of the work provided in the construction contract. At the Bank's initiative, a meeting was held in Washington, D.C., on March 6, 1985, between representatives of the Egyptian American Bank, Kramico, and the Kettaneh Group on the one hand and the Department of State on the other hand. The Bank followed up this meeting with a letter to the Department on March 11, 1985, and a formal proposal on April 22, 1985, for completion of the project with the Kettaneh Group as general contractor. This proposal was rejected by the Department on July 3, 1985, which thereafter issued an Invitation to Bid soliciting bids for a new contract.

Meanwhile, on April 24, 1985, the Bank had submitted a claim with the contracting officer, in its own right or as Kramico's assignee, based on the Contract Disputes Act of 1978. Asserting that it was Kramico's "surety," the Bank sought four items of relief totalling $3,233,957.31:

1) the return of the $2,759,980 paid to the Department pursuant to the "performance bond" (also identified as Letter of Guarantee No. 82/6849) dated November 11, 1982;

2) the return of the $352,000 paid to the Department pursuant to Letter of Guarantee No. 82/6848, as amended;

3) the progress payment of $36,697.20 determined in Contract Estimate No. 23 as the balance due Kramico for the work period of October 2 to November 6, 1984;

4) the sum of $85,280.11 withheld by the Department "for materials allegedly unpaid by Kramico," as determined in the Government's revised Estimate No. 23.

The Bank's claim was denied on procedural and substantive grounds in a letter from an Attorney-Advisor in the Department's Office of the Legal Adviser, dated June 7, 1985, although this letter did not constitute a final decision of the contracting officer. The Attorney-Advisor's letter pointed out that the right to receive a formal, final decision of the contracting officer derives from the Contract Disputes Act of 1978, 41 U.S.C.A. 601 *et seq.* (1985 Supp.), whose coverage is limited to claims submitted by "contractors." In FBO Contract No. 3416–231001, however, the contractor was Kramico, S.A.E., not the Egyptian American Bank. Accordingly, the Bank had no standing to claim under the Contract Disputes Act. The Attorney-Advisor's letter also disputed the Bank's characterization of itself as Kramico's "surety." The language of the Bank's "Letter of Guarantee No. 82/6849" was cited as establishing nothing more than an unconditional obligation to pay the stated sum on demand, which the Bank did on January 14, 1985.

The instant action was filed by the Bank on October 22, 1985. Defendant filed its answer, which included the counterclaim for $88,000, on January 21, 1986. Plaintiff's motion for summary judgment was filed May 22, 1986, followed by defendant's cross-motion for summary judgment on July 7, 1986. Oral argument was heard on June 23, 1987.

## DISCUSSION

### I. *Jurisdiction*

Subject matter jurisdiction of this action is conferred by the Tucker Act. This statute provides that an action against the United States may be maintained in the Claims Court if "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (1982).

■ The fact that plaintiff is a foreign national, however, does raise a question as to its standing to sue in this court. 28 U.S.C. § 2502(a), entitled "Aliens' privilege to sue," provides as follows:

> Citizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the United States Claims Court if the subject matter of the suit is otherwise within such court's jurisdiction. (As amended Apr. 2, 1982, Pub.L. 97–164, Title 1 § 139(a), 96 Stat. 42).

At the court's request, the parties filed briefs on this point of law. Both parties consulted eminent lawyers in Egypt who stated that United States citizens may bring suit in Egypt against the Egyptian government. Contract disputes arising out of the construction of public works, such as an Egyptian embassy building, are heard before an administrative court called the Council of State. Contractors may seek either monetary damages or specific performance from the Egyptian government.[1] Based on the foregoing evidence, the court concludes that reciprocity exists for the purposes of 28 U.S.C. § 2502(a).

Plaintiff also asserts that the court has jurisdiction of this action under the Contract Disputes Act of 1978, 41 U.S.C. § 609(a). For the reasons discussed hereinafter, the court rejects this contention.

## II.  *Letter of Guarantee No. 82/6849*

Summary judgment is appropriate where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). *Weide v. United States*, 4 Cl.Ct. 432 (1984), 765 F.2d 157 (Fed.Cir.1985), *cert. denied*, 474 U.S. 822, 106 S.Ct. 74, 88 L.Ed.2d 61 (1985). The court concludes that there are no disputed issues of material fact with regard to the above instrument, and that the disposition of the cross-motions for summary judgment hinges on the document's legal import.

The dispositive question is whether the instrument issued by the Bank on November 11, 1982, entitled "Letter of Guarantee No. 82/6849" but labeled by the Bank a "Performance Bond," created the rights and obligations of a surety in the Bank or simply those of a guarantor with an unconditional primary obligation to pay the sum of $2,759,980 on demand. The Bank concedes that it was obligated to pay the above sum on demand, but contends that it was a surety entitled to take over and complete the construction contract and thus attempt to mitigate its loss. In demanding payment and subsequently rejecting the Bank's proposal for completion of the project, therefore, plaintiff argues that defendant violated its rights as a surety.

■ Under a performance bond, a surety's rights and obligations are co-extensive with those of its principal. The surety may raise any defenses that the principal could raise to the demands of the beneficiary, including a demand for payment on the bond. Upon default of the underlying contract between the principal and the beneficiary, the surety steps into the shoes of its principal. The surety assumes primary responsibility for the completion of the contract. Under the Federal Procurement Regulations, a surety may complete the contract itself or allow the government to find a new contractor and pay the government the expense of completion. (41 C.F.R. § 1–18.803–6 (1982), in effect when the instrument here at issue was executed.) Whatever its choice, a surety is responsible for the expense of completion up to the applicable bond limit. *Morrison Assurance Company, Inc. v. United States*, 3 Cl.Ct. 626, 632 (1983); *Great American Insurance Co. v. United States*, 481 F.2d 1298, 202 Ct.Cl. 532, 550, 551 (1973).

■ Under a letter of guarantee, also known as a letter of credit, the guarantor's duty to pay is entirely independent of issues in contention between the principal and the beneficiary. A letter of guarantee obligates the issuer to pay the sum stated on demand and without contestation of is-

---

1. Affidavit of Sherif Saad, dated August 20, 1987.

sues arising from the underlying contract. The guarantor has neither the duty nor the right to take over and complete the underlying contract, unless that contract is expressly incorporated into the letter of guarantee. *Philadelphia Gear Corp. v. Central Bank*, 717 F.2d 230 (5th Cir.1983); *Rockwell International Systems, Inc. v. Citibank, N.A.*, 719 F.2d 583, 587 (2nd Cir. 1983); *Bank of Newport v. First National Bank & Trust Co. of Bismarck*, 687 F.2d 1257, 1261 (8th Cir.1982).

■ In determining the nature of the Bank's relationship to the Department, the first rule of interpretation for contracts and other legal instruments is to look to the language of the document itself. As previously set forth, the instrument entitled "Letter of Guarantee No. 82/6849" stated that "(the Bank) agree(s) to pay ($2,759,980) on (the Department's) first demand, notwithstanding any contestation from (Kramico)." This provision is inconsistent with a basic element of suretyship— the surety's right to step into the shoes of its principal and contest what it perceived to be an improper default termination by the beneficiary. At two places on the instrument the Bank typed in the words "PERFORMANCE BOND." This term first appears directly beneath, like a subtitle to, "LETTER OF GUARANTEE NO. 82/6849." It next appears in the section describing the sum of $2,759,980 as being held "in connection with the performance bond for the construction of new embassy office building tower & related work on embassy compounds, as per contract agreement no. 3416–231001 dated Nov. 3, 1982." However, the instrument contains no language to the effect that the Bank's rights and duties were co-extensive with Kramico's, that it had a right to take over the contract in the event of default, that it had any rights or duties whatsoever except to pay the stated sum upon the Department's demand.

The parties do not dispute that the type of bond which the Department originally sought from the Bank, in the amount of 10 percent of the contract price, was a performance bond. Kramico's letter to the Bank on November 6, 1982, requesting the issuance of a performance bond, indicated that it should be issued o'n the Government's standard form DS 1167, a copy of which was enclosed. This form, entitled "Performance and Guaranty Bond," contained the following pertinent provisions:

> ... We, the PRINCIPAL AND SURETY above named, are held and firmly bound unto the United States of America, hereinafter called the Government, in the penal sum of the amount stated above....
>
> ... whereas the principal entered into a certain contract with the Government ... if the Principal shall well and truly perform and fulfill all the undertakings, covenants, terms, conditions, and agreements of said contract during the original term of said contract and any extensions thereof that may be granted by the Government ... then, these obligations to be void....

This form clearly sets forth a joint undertaking of the principal and surety. The surety's right of contestation is inherent in the standard government bond, since the form expressly states that its obligations are void if the principal performs. Had it used the government form, therefore, the Bank would have had the right to contest the Department's demand for payment by asserting that Kramico had duly performed on its contract and should not be declared in default.

The Bank chose not to use the standard form DS 1167, however, and instead substituted its own standard form entitled "Letter of Guarantee No. _____." By this instrument the Bank undertook the following specific obligation(s) toward the Department:

> We hereby undertake to hold at your disposal the sum of ($2,759,980). *We agree to pay to you this amount on your first demand, notwithstanding any contestation from the above-named.* (Emphasis added).

These provisions set forth a different undertaking by the Bank than that of a surety as set forth in the Government's form DS 1167. The Bank's assumption of an unconditional obligation to pay upon the

Department's demand, notwithstanding any contestation by Kramico of the default declaration, was an undertaking entirely separate and distinct from the construction contract and inconsistent with the right of a surety to step into the shoes of its principal, the contractor.

Plaintiff argues that its aforementioned typed insertions of "performance bond" and reference to the underlying construction contract between Kramico and the Department have the legal effect of making the Bank's instrument a performance bond and the Bank a surety thereunder. Plaintiff contends that its typewritten phrases as a matter of law supercede the phrases on the printed form. 4 S. Williston, *A Treatise on the Law of Contracts* § 622 (3d ed 1961 & Supp.1985). This is a secondary rule of contract interpretation, however, which is subordinate to the primary rule that a document must be read as a whole and so construed as to give effect, if possible, to all of the provisions thereof. 4 *Williston on Contracts*, Third Edition, § 618 (1961); 1 McBride and Wachtel, *Government Contracts*, § 2.10[3] and § 2.140, (1963, rev. 1987). Applying this principle to the instrument at issue, it is clear that the court may not give consideration to plaintiff's typed insertions to the exclusion of the form's printed language.

In analyzing plaintiff's typed insertions, moreover, it must be emphasized that the mere use of the term "performance bond," does not give an instrument legal effect as such, absent provisions therein setting forth the pertinent rights and obligations of the contracting parties. No such provisions appear in the Bank's instrument. The provision indicating that the sum of $2,759,980 was being held by the Bank "in connection with the performance bond for the construction (project) ... as per contract agreement no. 3416–231001 dated Nov. 3, 1982" does affirm that the instrument was issued in response to the call for a performance bond in the construction contract between Kramico and the Department of State. But the language of this provision cannot be read as expressly incorporating the terms of the underlying construction contract into the Bank's financial instrument, and standing alone the language does not convey the attributes of a surety upon the Bank.

Plaintiff argues that the parties' course of conduct from the time the instrument was issued on November 11, 1982, supports its contention that both the Bank and the Department understood the instrument to be in the nature of a performance bond. The court does not share this view.

The fact cannot be overlooked that the Government's standard performance bond form was sent to the plaintiff, but the Bank chose not to use it. Instead, the Bank executed its own instrument on a standard letter of guarantee form containing language incompatible with the rights and obligations of a surety. The Department accepted this instrument in lieu of a performance bond, as indicated by counsel for the defendant at oral argument, because it adequately protected the government's interests.[2] Counsel for the defendant pointed out that the general requirement of a performance bond in construction contracts with the U.S. Government may be waived for construction contracts involving U.S. diplomatic missions abroad. 22 U.S.C. § 294, 44 Stat. 404, May 7, 1926, as amended. Accordingly, the Department's acceptance of the Bank's instrument without comment did not, in and of itself, confer upon it any attributes of a performance bond.

On May 13, 1984, the Bank's Deputy Manager sent a letter to the Department's "Foreign Building Office" (FBO) on the subject of "our letters of guarantee no. 82/6848 & no. 82/6849." This letter affirmed that "As stated in the wording of both guarantees, it (sic) is available upon your first demand, notwithstanding any contestation from our client (in this case Kramico)." The only acts required of the FBO were the submission of a formal letter and the original guarantee(s). The Bank's letter made no mention of any option to take over and complete the contract, which

---

**2.** Transcript of Proceedings, p. 25

would have been the right of a surety operating under a performance bond.

On January 14, 1985, upon performance of the acts called for in the letter of May 13, 1984, the FBO's Project Manager in Cairo, Mr. Toussaint, was presented with a check for $2,759,980 on "Letter of Guarantee No. 82/6849" from Dr. Saad, the Vice Chairman of Egyptian American Bank. Dr. Saad did not invoke or refer to any right of the Bank's to take over the construction contract instead of making payment, or to contest the FBO's termination of the Kramico contract for default. Thus, both parties acted in a manner consistent with the defendant's interpretation of "Letter of Guarantee No. 82/6849" as nothing more than an unconditional obligation to pay on demand.

Plaintiff cites three pieces of government correspondence between November 1982 and January 1985 containing references to "surety bonds," or "Kramico's surety," or "performance bond" as evidence that the Department regarded the Bank as a surety. The court has reviewed this documentation, but finds plaintiff's argument unpersuasive. The above terminology was not amplified in the pertinent documents to describe any rights and duties of a surety. Defendant maintains that reference to the Bank as a "surety" was erroneous, and that an occasional incorrect use of a term by government officials cannot change the nature of the Bank's obligation. This obligation was clearly stated on the face of the instrument, and affirmed in the letter of May 13, 1984, from the Vice Chairman of the Bank. Next to these two documents, which set forth a role for the bank incompatible with the rights and duties of a surety, the government correspondence cited by plaintiff carries little evidentiary weight.

Based on the foregoing analysis, the court concludes that the instrument entitled "Letter of Guarantee No. 82/6849," as a matter of law, created an unconditional primary obligation in the plaintiff to pay the sum of $2,759,980 on the defendant's first demand, subject only to the latter's

presentation of a formal letter and the instrument itself. The instrument did not convey any rights upon the plaintiff to contest defendant's default declaration or to take over and perform on the contract. Accordingly, the plaintiff was not a surety, and had no further rights or obligations with respect to the underlying construction contract after it paid the sum stated on the instrument to defendant on January 14, 1985.

Therefore, the court denies plaintiff's motion for summary judgment with respect to "Letter of Guarantee No. 82/6849" and grants defendant's cross-motion for summary judgment. This part of plaintiff's complaint is therefore dismissed.

### III. The Contract Disputes Act

■ Plaintiff asserts that the Contract Disputes Act of 1978 confers jurisdiction of the instant case upon this court, citing *Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed.Cir.1985) and *Universal Surety Co. v. United States*, 10 Cl.Ct. 794 (1986) for the proposition that "the position of a surety on a Government contract is sufficiently similar to that of a contractor to allow suit under the Act." [3] Quite aside from the fact that *Balboa* did not allege any claim under the Contract Disputes Act and the court specifically held that *Universal Surety* was "not a party to the construction contract, and therefore not a 'contractor' under the CDA," plaintiff's proposition presupposes that the Bank was acting as a surety in regard to the contract involved in this case. As the court has held that the Bank was not a surety, however, plaintiff's jurisdictional argument fails upon its premise. The court deems it unnecessary to address other associated issues, such as whether the requirement of a final decision from the contracting officer has been satisfied.

Plaintiff's complaint also asserts a claim for interest under the Contract Disputes Act of 1978, 41 U.S.C. § 611. Since the court has no jurisdiction under the above

**3.** Plaintiff's Supplemental Memorandum, dated July 21, 1987, p. 12.

Act and has entered no judgment in favor of the plaintiff, this claim is rendered moot.

### IV. *Letter of Guarantee No. 82/6848*

▆ With regard to defendant's $88,000 counterclaim on the above instrument, issued by the Bank on November 10, 1982, and amended on November 11 and December 6, 1982, the court finds material fact(s) at issue precluding summary judgment for either party. The parties do not dispute the nature of this document as an unconditional primary obligation of the Bank to pay on the Department's demand a sum up to $2,200,000, or whatever lesser amount remained outstanding on the Government's advance payment to Kramico. At issue is the proper amount owed at the time of demand—January 13, 1985—according to the advance payment reduction provision in the amendment of December 6, 1982.

As aforementioned, the original Contract Estimate No. 23 was issued on November 20–21, 1984, and showed a balance due Kramico (after an $88,000 advance repayment deduction) of $36,697.20 for the period October 2 to November 6, 1984. This Estimate, which left a balance outstanding on the advance payment of $352,000, was approved by FBO's Project Supervisor, Mr. Toussaint, and certified correct by the contractor. The form provided that the original and one copy were to be delivered to the Post Fiscal Officer to process payment and that "final payment must have prior approval of the Department."

Such approval was not forthcoming, however, and no payment was made to Kramico on the basis of Contract Estimate No. 23, because of the revelation of certain outstanding debts of the contractor. Instead, a revised Contract Estimate No. 23 was prepared and issued on December 23, 1984, which showed no balance due and no advance repayment deduction for the period of October 2 to December 23, 1984, and left an outstanding balance on the advance payment of $440,000. This revised estimate was also approved by FBO's Project Supervisor and a Kramico representative.

Plaintiff argues that the issuance of Estimate No. 23 satisfied the contractual requirement for reducing the letter of guarantee, and that neither the letter of guarantee nor the underlying construction contract authorized the Department to issue a revised estimate invalidating an original estimate. Defendant, on the other hand, argues that the letter of guarantee reduced in value only upon actual repayments by Kramico of the Government's advance payment, which revised Estimate No. 23 stated did not occur for the final work period.

The pertinent language in Letter of Guarantee No. 82/6848 (amendment of December 6, 1982) provides that "The amount of this Letter of Guarantee will be reduced upon presentation of Contract Estimates ... certifying partial repayments of the advance payment in conjunction with progress payments ..." This wording is imprecise, in that it telescopes a two-step procedure into one long-winded sentence that fails to distinguish which of two distinct acts—the issuance of a contract estimate or the issuance of a progress payment—triggers a reduction in the amount of the guarantee. The two acts cannot occur simultaneously since progress payments, and repayments on the advance payment *in conjunction* therewith, can only be made with the Department's approval *after* presentation of the contract estimates. The basic question, therefore, is whether the presentation of a contract estimate must be followed by an actual progress payment in order to reduce the outstanding balance on the guarantee.

Thus, the record at this time with respect to Letter of Guarantee No. 82/6848 is insufficient to permit the court to make the factual determination(s) necessary to warrant an entry of summary judgment for either party. Accordingly, the motions of both parties for summary judgment on defendant's counterclaim are denied.

No costs.

IT IS SO ORDERED.