Teresa Alen FERREIRO,
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 00–648 C.   .

United States Court of Federal Claims.

Oct. 29, 2002.

Charles P. Randall, Boca Raton, Florida, for the plaintiff. Carlos A. Enriquez, Miami, Florida, of counsel.

David D'Alessandris, Washington, D.C., with whom were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, Mark A. Melnick, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the defendant.

## OPINION

BUSH, Judge.

This case is currently before the court on defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to Rule of the Court of Federal Claims (RCFC) 12(b)(1) filed February 1, 2001, and plaintiffs' motion for certification as class action, filed November 2, 2000.

## BACKGROUND

### I. Factual Background

In their Second Amended Complaint for Money Damages and Call and Discovery, filed March 21, 2002, Teresa Alen Ferreiro Viuda de Perez, as Surviving Spouse of Luis Perez, deceased; Dorothy Erasmo Jeffers, as Surviving Spouse of Charles Jeffers, deceased; and Mario Vazquez Lopez seek pension benefits not paid since the imposition of the Cuban Embargo. In their Motion to Certify Class, filed November 2, 2000, plaintiffs contend that this action should be certified as a class action, as the claims and defenses of these representative parties are typical of the claims or defenses of the class and the representative parties will fairly and adequately protect the interests of the class. The plaintiffs are Cuban Nationals living in Cuba. The plaintiffs and those they represent were among an undetermined number of Cuban Nationals enlisted in the Armed Forces of the United States during the Second World War and were therefore afforded the opportunity to participate in the Civil Service Retirement System. Some of the plaintiffs remained employed at the Guantanamo Bay Naval Facility in Cuba following the end of the war, and some of them served with distinction and were presented military awards and honors. Plaintiffs are presently prohibited from traveling to the United States by both the United States and the Republic of Cuba.

Plaintiffs' benefits have not been paid, escrowed, or accounted for since the United States imposed the Cuban Embargo in 1963. All government agencies owing monies to Cuban Nationals suspended pension, social security, and veterans' benefits pursuant to United States Department of the Treasury (Treasury) regulations. In a letter dated February 10, 1964, the United States Civil Service Commission explained that:

It has now been determined that there is no reasonable assurance that a payee living in Cuba will actually receive United States Government checks or be able to negotiate them for full value. Therefore, since the United States Treasury Department Regulations now prohibit payments to persons residing in Cuba, Civil Service annuity payments are being suspended. This stoppage of payments applies to all Civil Service annuitants and survivor-annuitants residing in Cuba including those whose Civil Service annuity checks were being delivered to an address outside Cuba. This means that any checks to which you were entitled which were dated after January 2, 1963, will not be issued.

If payments to Cuban residents are resumed at some time in the future, the Civil Service annuity benefits which were withheld will be paid provided all conditions for entitlement to such benefits have been met.

Exhibit C to Second Amended Complaint.

Plaintiffs contend that they are Cuban Nationals who are afforded the privilege to sue the United States pursuant to 28 U.S.C. § 2502. They assert that citizens of the United States are afforded reciprocal rights before the courts of the Republic of Cuba equal to those rights of Cuban Nationals, and plaintiffs are therefore permitted to bring suit in this court pursuant to that statute. Plaintiffs assert, in support of this argument, that the Embargo imposed by the United States against travel to Cuba "has been, in large part, a failure and that large numbers of the Citizens from the United States frequent the island each year and make use of its Courts where appropriate." Second Amended Complaint at 2–3. Plaintiffs further contend in this regard:

For many years, U.S. Citizens have ignored, and the Treasury has failed to prosecute, the large number of Americans who travel to Cuba without a Treasury License. In addition to average Citizens, Movie Stars, Celebrities and former U.S. Government Officials are known to routinely travel to Cuba, without permission, through the numerous and well defined points of entry. So well known are these points of entry that a system has arisen whereby Americans "illegally" traveling to Cuba are aided by foreign governments who surreptitiously provide travel routes designed to hide these visits from U.S. Customs when the Americans return. Plaintiffs assert with certainty that as litigants before a Cuban tribunal, U.S. Citizens stand on an

equal footing with Citizens of the Republic of Cuba and receive a fair and impartial hearing and fair judicial remedy.

*Id.* at 3.

Plaintiffs assert, in the alternative, that the reciprocity requirement contained in 28 U.S.C. § 2502 is inapplicable in the instant matter as the claims asserted against the United States are not disputed nor contingent. Rather, plaintiffs contend, the United States has "admitted owing the monies sought herein and has merely 'delayed' making payment for the past thirty-seven (37) years of the Embargo." *Id.* Plaintiffs contend, in support of this argument, that the continued imposition of the Embargo is no longer an impediment prohibiting payment of monies to Cuban Nationals as the Treasury regulations themselves currently provide for safekeeping in blocked accounts and restricted payments pursuant to 31 C.F.R. Part 515, *et seq.*

In their "First Cause of Action for Money Damages (Payment of Civil Service Annuities)," plaintiffs contend that their benefits were merely "suspended" by virtue of the applicable Treasury regulations. Plaintiffs point to two facts in support of this statement: (1) the Treasury determined that the mail delivery system in place in Cuba in 1963 did not appear to provide "reasonable assurance that a payee living in Cuba [would] actually receive United States Government checks;" and (2) the Treasury determined that in 1963 the government of the Republic of Cuba provided no reasonable assurance that the plaintiffs would "be able to negotiate (the checks) for full value." *Id.* at 6. Plaintiffs contend there has never been a question of their entitlement to these benefits such as to require them to first apply to the Office of Personnel Management or appeal any adverse determination to the Merit Systems Protection Board. Plaintiffs contend: "The effect of the Cuban Embargo upon the obligations of the United States does not operate as a forfeiture of those payments. Instead, current Regulations require that sums owed to Cuban Nationals be placed in block accounts and disbursed according to law." *Id.* Plaintiffs contend that the "[c]lass" is entitled to the immediate payment into blocked accounts of all monies, with interest calculated at the legal rate, currently being held by the United States Civil Service Commission.

In their "Second Cause of Action for Money Damages (Unjust Enrichment)," plaintiffs aver that the United States currently holds monies belonging to individuals who were given the opportunity to participate in the Civil Service Retirement System in return for their services rendered to the Allied forces during World War II and thereafter. Plaintiffs contend the United States should be required to make restitution of the property retained, and the mechanism for payment of such funds into blocked accounts is provided for by the government's own regulations, 31 C.F.R. Part 515, and such action would involve no violation or frustration of law or opposition to public policy.

In their "Third Cause of Action (Certification of Class Action)," plaintiffs contend that their case should be certified as a class action. They contend that although the exact number of potential members of the class is presently unknown, it is estimated that the number of annuitants may be in the hundreds.

In their "Fourth Cause of Action (Call and Discovery)" plaintiffs seek discovery pursuant to 28 U.S.C. § 2507, and allege that the identity of members of the potential class as well as the accrual of benefits is within the exclusive possession and knowledge of the United States. Plaintiffs allege that, to date, they have experienced some difficulty in attempting to locate service records and establish eligibility for benefits of potential class members.

In their "Fifth Cause of Action (Payment of Monies Being Held in Trust)," plaintiffs invoke 31 C.F.R. § 515.205. Plaintiffs contend that the defendant did or should have complied with the provisions of this regulations and is now holding these sums that properly belong to the plaintiffs. Plaintiffs contend the defendant has been accumulating these funds and now owes both the principal and interest thereon.

In sum, plaintiffs seek the following:

a) ... [A]n Order requiring the Civil Service Commission to pay into blocked

accounts all sums representing annuities being held for the Class Members;

b) The immediate Call and Discovery for production, without cost to the Class, of all documents which may provide information as to the identities and last known addresses of each Cuban National who has been entitled to benefits of any kind within the last thirty-seven (37) years;

c) The identification of all individuals employed by the Defendants who have knowledge of the records sought to be obtained;

d) The full accounting of monies held pursuant to 31 C.F.R. § 515.205, plus the accumulation of interest thereon and the immediate payment of these funds to the plaintiffs; and

e) For other relief as is just and proper.

Second Amended Complaint at 11.

## II.  Procedural History

Plaintiffs in this case filed their original complaint on November 2, 2000. On this date, they also filed their motion for certification as a class action. On December 18, 2000, defendant filed its opposition to plaintiffs' motion for class certification. On December 21, 2000, defendant filed a motion to stay discovery pending the government's response to plaintiffs' complaint, or until resolution of the threshold question of this court's jurisdiction to entertain plaintiffs' complaint. The defendant filed its motion to dismiss for lack of jurisdiction on February 1, 2001. Plaintiffs filed a motion to file a first amended complaint on March 6, 2001. Plaintiffs' first amended complaint contained additional jurisdictional allegations and was filed by order of the court on June 7, 2001. On August 6, 2001, pursuant to the court's order, defendant filed a supplemental brief to address issues, arguments, or precedent raised in plaintiffs' amended complaint that were not previously addressed in defendant's pleadings. On August 17, 2001, plaintiffs filed their motion for oral argument hearing. On August 21, 2001, plaintiffs filed their motion to file an additional response in opposition to defendant's motion to dismiss.

Plaintiffs once again moved to amend their complaint in their motion to file a second amended complaint, filed December 6, 2001. They sought to add a Fifth Cause of Action (Payment of Monies Being Held in Trust). Initially, the defendant submitted no indication as to its position with regard to this motion. Accordingly, in a January 9, 2002 order this court directed defendant to file a brief statement setting forth its position on plaintiffs' proposed motion. In turn, on January 24, 2002, defendant filed its statement regarding plaintiffs' motion for leave to file a second amended complaint. In this statement, the government did not clearly state that it opposed the proposed amendment, but rather stated that "[w]e recognize that there is a permissive standard for amendment in this Court's rules; however, we believe that plaintiffs' motion for leave to amend their complaint is futile." On February 11, 2002, plaintiff again moved for oral argument. On March 21, 2002, the court issued an order wherein it granted plaintiffs' motion to file a second amended complaint; granted the government the opportunity to file supplemental briefing to the extent that defendant's counsel believed plaintiffs' amended complaint raised issues, arguments, or precedent not previously addressed in defendant's pleadings; granted plaintiffs' motion to file an additional response in opposition to defendant's motion to dismiss; and granted plaintiffs' motion for an oral argument on the government's motion to dismiss. Pursuant to the court's order, the second amended complaint was filed March 21, 2002. Defendant filed its supplemental brief on May 21, 2002.

Significantly, in this court's order of June 14, 2002, the court ordered counsel for the defendant in this matter to obtain from the United States Department of State (State Department) a written, official statement directly addressing the issue of whether the Cuban government, in fact, accords United States citizens the right to fully prosecute claims against the Cuban government in Cuban courts. The court issued this order to assist it in determining whether United States citizens have "the right to prosecute claims against [the Cuban] government in [Cuban] courts," sufficient to comply with the

reciprocity requirement of 28 U.S.C. § 2502. The court stated that the defendant was to file this written opinion with the court on or before August 30, 2002.

On June 26, 2002, pursuant to this court's order of March 21, 2002, plaintiffs filed their additional response to the government's motion to dismiss. On July 1, 2002, plaintiffs filed their motion for an evidentiary hearing regarding the government's contention that citizens of the United States are not allowed to fully prosecute claims against the Cuban government in Cuban courts. On July 11, 2002, defendant filed its opposition to plaintiffs' motion for an evidentiary hearing. On August 5, 2002, this court issued an order denying plaintiffs' motion for an evidentiary hearing as premature, as this court had specifically set forth its intention to consider the State Department's official statement in conjunction with this matter in its June 14, 2002 order.

On August 27, 2002, defendant filed a motion for an enlargement of time of 46 days, to and including October 15, 2002, within which to file the requested statement from the U.S. Department of State. Plaintiffs opposed this motion. On September 3, 2002, this court issued an order wherein it granted defendant's motion.

On September 23, 2002, this court issued an order wherein it: (1) denied plaintiffs' opposition to defendant's motion for an enlargement of time filed September 4, 2002; (2) denied plaintiffs' motion for call and discovery filed September 4, 2002; (3) granted plaintiffs' notice of withdrawal of motion to compel issuance of travel license; and (4) stayed all discovery in this matter pending the resolution of the government's motion to dismiss filed February 1, 2002.

## DISCUSSION

### I. MERITS—Defendant's motion to dismiss pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction

#### A. Standard of Review

The government contends in its motion to dismiss that plaintiffs' second amended complaint should be dismissed for lack of juris-

diction. RCFC 12(b)(1), which is identical to Rule 12(b)(1) of the Federal Rules of Civil Procedure, provides for dismissal of a claim for a "lack of jurisdiction over the subject matter." Fed.R.Civ.P. 12(b)(1); RCFC 12(b)(1). If there is no jurisdiction, this court must dismiss the action.

This court's subject matter jurisdiction is strictly construed. *United States v. John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372–74 (Fed.Cir.1983); *Mega Constr. Co. v. United States*, 29 Fed.Cl. 396, 472 (1993). The non-moving party bears the burden of establishing jurisdiction by a preponderance of the evidence. *Thomson v. Gaskill*, 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951 (1942); *Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed.Cir.1993); *Reynolds v. Army & Air Force Exchange Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988). In ruling on a motion to dismiss for lack of subject matter jurisdiction, the court will generally consider the facts alleged in the complaint to be true and correct. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). If, however, jurisdictional facts are in dispute, then a court may consider relevant evidence in order to resolve the factual dispute. *Reynolds*, 846 F.2d at 747 (citing *Land v. Dollar*, 330 U.S. 731, 735, 67 S.Ct. 1009, 1010, 91 L.Ed. 1209 (1947)). Ambiguities regarding the existence of subject matter jurisdiction should be "resolved against the assumption of jurisdiction." *Mars Inc. v. Kabushiki–Kaisha Nippon Conlux*, 24 F.3d 1368, 1373 (Fed.Cir.1994) (citation omitted). Significantly, a decision to dismiss an action for a lack of jurisdiction does not carry *res judicata* effect, and therefore does not present a bar to a subsequent action on the merits in a court of competent jurisdiction. *Do–Well Machine Shop, Inc. v. United States*, 870 F.2d 637, 640 (Fed.Cir.1989); *Cubic Defense Systems, Inc. v. United States*, 45 Fed.Cl. 239, 248 (1999).

#### B. Reciprocity Requirement

##### 1. The parties' arguments

The government contends that plaintiffs are foreign nationals entitled to bring suit in this court only if their sovereign affords the same rights to American Nationals. The

government contends that plaintiffs are unable to establish the required reciprocity. The government further avers that even if plaintiffs could establish an entitlement to bring suit in this court, their claims must still be dismissed for lack of subject matter jurisdiction.

The government contends that Cuban Nationals are not entitled to bring suit in the United States Court of Federal Claims. Foreign nationals are only permitted to bring suit against the United States pursuant to 28 U.S.C. § 2502 which provides, in pertinent part:

> Citizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the United States Court of Federal Claims if the subject matter of the suit is otherwise within such court's jurisdiction.

This statute is known as the "reciprocity requirement." The government contends that because U.S. citizens do not have an effective means of bringing suit against the Cuban government in the Cuban judicial system, this court is without jurisdiction to hear plaintiffs' claims.

Plaintiffs allege that the benefits to which they plead entitlement properly fit within the jurisdictional mandate contained in the Tucker Act, 28 U.S.C. § 1491, as the benefits themselves are "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). And in support of their argument that their complaint adequately pleads reciprocity, plaintiffs state that "[m]any things have changed in thirty-seven (37) years since the imposition of the Embargo." Plaintiffs' Opposition at 6. Plaintiffs' counsel contends that:

> Recently, the undersigned has twice traveled to Cuba, with a License to Travel that was granted by the Treasury, for a combined total of approximately eight (8) days. In that time, I have personally met on the street no less than twenty (20) Americans

who traveled to Cuba in violation of the Treasury's restrictions. To say that the travel ban is a "sieve" is an understatement. Americans travel unmolested through ports in Jamaica and Mexico and their luxury yachts can be seen tied up in Havana ports. Once there, they spend U.S. Dollars with such frequency that the money has actually become Cuba's unofficial currency. It would not be surprising to learn that many Americans feel so sheltered from prosecution for travel ban violations that they become emboldened to seek redress in Cuban Courts in appropriate circumstances.

Plaintiffs' Opposition at 6.

In support of their claim that reciprocity exists, plaintiffs also submit the affidavit of Jorge Cobas, attached as Exhibit 4 to Plaintiffs' Opposition to Defendant's Motion to Dismiss. Plaintiffs state that Mr. Cobas recently immigrated to the United States in order to obtain medical treatment for his seriously ill son. While living in Cuba, Mr. Cobas was a licensed attorney authorized to practice law before the Cuban Courts. His affidavit provides:

> As a licensed attorney, I have represented as clients Citizens of the United States who have brought claims against both the Citizens and the Government of the Republic of Cuba before the Courts in Havana, Cuba. In fact, when I left Havana to take residence in Florida, I was representing the interests of a United States Citizen in a legal action filed in the Courts of Cuba. By way of further explanation, a Citizen of any country, including those of the United States, has the ability to seek judicial relief in a Cuban Court, even if the claim is against the Republic of Cuba. Legitimate claims against the Government are paid upon the establishment of sufficient proof. There is absolutely no prohibition placed upon a Citizen of any country in seeking judicial relief and that person stands on an equal footing with the rights afforded to the Republic of Cuba.

Plaintiffs' Opposition at 6–7.

Plaintiffs contend this affidavit is sufficient to establish reciprocity based on *Humphries*

*v. United States*, 44 Fed.Cl. 81, 82 (1999), where, in the context of deciding whether reciprocity exists under 28 U.S.C. § 2502 between Kenya and the United States, the court found:

> [I]n order to meet the requirements of section 2502(a) [plaintiff] could submit as affirmative evidence of reciprocity: any statutes or case law on the subject; an affidavit or deposition from an experienced Kenyan attorney or relevant government official (i.e. the Kenyan equivalent to the United States Department of Justice); or similarly probative evidence.

In its additional response to the defendant's motion to dismiss, the plaintiffs also note that in March of 2002, a Cuban widow named Raquel Hernandez traveled to Florida in March of this year and obtained from the government a payment of over $88,000, representing pension benefits owed for the last twenty-five years to her deceased husband by the government.

In response, the government contends that although Mr. Cobas' affidavit does state that he has represented United States citizens in actions against the Cuban government, it does not state that the Cuban court system exercised jurisdiction over these claims. Further, states the government, Mr. Cobas' affidavit does not state that the United States citizens received a fair and impartial hearing or that United States citizens received a judicial remedy. The government notes that stating that "legitimate claims" against the Cuban government are paid is not the same as stating that there is a fair and impartial court system. The plaintiffs assert that it is not necessary for the plaintiffs to establish that U.S. citizens receive fair and impartial hearings or judicial remedies before the Cuban tribunals.

In further support of its contention that reciprocity under 28 U.S.C. § 2502 does not exist, the government points to a variety of evidence including State Department reports; the International Claims Settlement Act of 1949; the Cuban constitution; the Senate Report for the Claims Against Cuba Act; and a law review article.

The government further argues that it is incumbent on the court to "carefully measure the scope of [its] jurisdiction in a situation where a rule in a foreign law book permits Americans free access to the courts but where it appears in practice that Americans are barred from the courts." *Nippon Hodo Co. v. United States*, 152 Ct.Cl. 190, 285 F.2d 766, 768 (1961). The government also refers to the well-established principle that "[i]n construing a statute waiving the sovereign immunity of the United States, great care must be taken not to expand liability beyond that which was explicitly consented to by Congress." *Fidelity Construction Co. v. United States*, 700 F.2d 1379, 1387 (Fed.Cir. 1983).

### 2. Standard for establishing reciprocity

Foreign nationals seeking to bring suit in the Court of Federal Claims must "affirmatively demonstrate that citizens of the United States are accorded the reciprocal right to sue the alien's sovereign in its courts." *Humphries v. United States*, 44 Fed.Cl. 81, 82 (1999) (citing *Pottawatomi Nation in Canada v. United States*, 27 Fed. Cl. 388, 390 (1992)). *See also Humphries v. United States*, 51 Fed.Cl. 35 (2001); *Paradissiotis v. United States*, 49 Fed.Cl. 16, n. 1 (2001); *Egyptian American Bank, S.A.E., v. United States*, 13 Cl.Ct. 337, 341 (1987). To establish reciprocity, it is not necessary to demonstrate that claims of the precise nature brought before this court may be prosecuted against the foreign government. *See Pottawatomi*, 27 Fed.Cl. at 392 (citing *Nippon Hodo Co.*, 285 F.2d at 767–68). It is only required that American citizens are entitled to prosecute claims against the foreign government and enjoy an equal standing with that country's citizens in the foreign state's court system. *Id.* However, as the government argues, the court should "carefully measure the scope of [its] jurisdiction in a situation where a rule in a foreign law book permits Americans free access to the courts but where it appears in practice that Americans are barred from the courts." *Nippon Hodo*, 285 F.2d at 768.[1]

---

**1.** It bears noting that in *Banco Nacional de Cuba*        *v. Sabbatino*, 376 U.S. 398, 408–10, 84 S.Ct. 923,

Insofar as this court can ascertain, the specific question of whether United States citizens have the right to prosecute claims against the Cuban government in Cuban courts has never been addressed by this court.

### 3. Application

■ As discussed *supra*, the threshold question the court needs to resolve in ascertaining whether it has jurisdiction to hear this case is whether plaintiffs may appropriately bring a suit in this court. Contrary to plaintiffs' argument, this is a question entirely distinct from whether plaintiffs' benefits claims fall within this court's general jurisdictional grant. As set forth above, the government presents a significant amount of evidence in support of its argument that reciprocity does not exist, and plaintiffs also present evidence in support of their argument that reciprocity does exist. The evidence proffered by the parties, including isolated affidavits, law review articles, and news clippings, is, however, totally inadequate to effectively answer the question of whether reciprocity exists. Therefore, as previously stated, in an attempt to gain an actual answer to this threshold question, rather than relying on anecdotal evidence from both sides, this court issued an order on June 14, 2002 requesting an official statement from the United States Department of State addressing the issue of whether the Cuban government accords United States citizens the right to fully prosecute claims against the Cuban government in the Cuban courts.

It is the view of this court that at this juncture it is prudent to rely on the official opinion of the United States Department of State dated October 15, 2002, which is attached to this judicial opinion in its entirety. The State Department is uniquely situated to render an official determination on the issue of whether the Cuban government accords United States citizens the right to fully prosecute claims against the Cuban government in the Cuban courts. Accordingly, this court will not undertake to conduct an evidentiary hearing on the matter, nor will it consider the parties' arguments and proffered evidence in this regard, as it appears to be piecemeal, disjointed, and wholly inadequate for this court to render a thorough and correct decision on the reciprocity issue.

That being said, this court has carefully read and fully considered the official statement from the United States Department of State, dated October 15, 2002. In this opinion, the State Department concludes:

> While the Cuban government tightly controls information in Cuba, the Department has reviewed the information available to it on this subject. Based on this information, the Department has concluded that any right of a U.S. citizen to pursue a claim against the Cuban government in Cuban courts is subject to the political interference of the Cuban government and, thus, that there are serious impediments to the ability of a U.S. citizen to pursue effectively a lawsuit against the Cuban government.

October 15, 2002 opinion of the United States Department of State at 1.

The official opinion from the State Department is both comprehensive, supported by facts and empirical evidence, and well-reasoned. There is no anecdotal evidence, such as that previously supplied to the court by the parties, which could supplant the opinion of the State Department. Accordingly, this court must conclude that it lacks jurisdiction over this matter pursuant to 28 U.S.C. § 2502, inasmuch as, based on the official opinion of the State Department relied upon by this court, there exist serious impediments to the ability of a U.S. citizen to pursue effectively a lawsuit against the Cuban government.

930–32, 11 L.Ed.2d 804 (1964), the Supreme Court of the United States found that an instrumentality of the Cuban government was permitted to maintain suit in federal court against a commodities broker for conversion of bills of lading. This case is readily distinguishable from the case at bar, however, in that the plaintiffs in this suit are not instrumentalities of the Cuban government, and the statute at issue in this case, 28 U.S.C. § 2502, specifically applies only to "[c]itizens or subjects of any foreign government."

### C. Plaintiffs' alternative request for waiver of the reciprocity requirement

■ In the alternative to their argument that reciprocity pursuant to 28 U.S.C. § 2502 does exist, plaintiffs contend that the court should suspend the reciprocity requirement for good cause shown in this circumstance, because the Cuban Nationals came to the aid of this country in time of war and became entitled to the benefits sought in this litigation through the direct employment by the United States. Plaintiffs contend the funds would not support the Communist regime. Significantly, however, any grant of jurisdiction to this court must be construed strictly before the court may accept jurisdiction. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); *Cosmic Construction Co. v. United States*, 697 F.2d 1389, 1390 (Fed.Cir.1982). As the United States Court of Appeals for the Federal Circuit has stated, "[i]n construing a statute waiving the sovereign immunity of the United States, great care must be taken not to expand liability beyond that which was explicitly consented to by Congress." *Fidelity Construction Co.*, 700 F.2d at 1387. Unfortunately, no matter how worthy the plaintiffs' cause, it is not within this court's power to expand the court's jurisdictional purview beyond that expressly consented to by Congress, and it therefore cannot grant plaintiffs' alternative request for waiver of the reciprocity requirement.

### D. Other alleged jurisdictional defects

Having reached the conclusion that the plaintiffs lack jurisdiction to entertain this matter in this court because of the reciprocity requirement, codified at 28 U.S.C. § 2502, there is no reason for this court to consider the question of whether this court lacks jurisdiction over plaintiffs' claims for any additional reasons.

## II. Other matters

The court also notes that in its order of March 21, 2002, it granted plaintiffs' motion for oral argument hearing, filed February 11, 2002, and stated that the date and time for this hearing would be set at a later date.

Upon receiving the official opinion of the United States Department of State, which is discussed *supra* and attached to this opinion, it is the decision of this court that it would be wasteful of the court's resources and the parties' resources to hold oral argument in this matter, as it would be futile. Although the court respects the plaintiffs' wish to "have their day in court," the court cannot justify expending the time and resources of either the government or the court in view of the fact that such argument would be futile. As such, the court rescinds its previous grant of plaintiffs' motion for oral argument.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** as follows:

(1) Defendant's Motion to Dismiss pursuant to RCFC 12(b)(1), filed February 1, 2001, is **GRANTED;**

(2) Plaintiffs' Motion for Certification of Class Action, filed November 2, 2000, is **DENIED** as moot;

(3) Defendant's Motion to Stay Discovery, filed December 21, 2000, is **DENIED** as moot;

(4) This court's March 21, 2002 grant of plaintiffs' motion for oral argument hearing, filed February 11, 2002, is **RESCINDED;**

(5) The Clerk's office is directed to enter judgment for defendant, dismissing this action for lack of jurisdiction pursuant to RCFC 12(b)(1); and

(6) Each party shall bear its own costs.

## ATTACHMENT

October 15, 2002

David D'Alessandris, Esq.

Commercial Litigation Branch

Civil Division

U.S. Department of Justice

1100 L Street, N.W.

Washington, DC 20530

Dear Mr. D'Alessandris:

We understand that "[t]o resolve the issue of whether United States citizens have 'the

right to prosecute claims against [the Cuban] government in [Cuban] courts,' sufficient to comply with the reciprocity requirement of 28 U.S.C. § 2502," the Court in the above captioned case has requested that the Department of State provide a written, official statement directly addressing the subject. The Department understands that, if the Department of Justice were unable to provide a written, official statement from the Department of State, the Court would issue a call upon the Department of State for the requested information, pursuant to 28 U.S.C. § 2507. While the Cuban government tightly controls information in Cuba, the Department has reviewed the information available to it on this subject. Based on this information, the Department has concluded that any right of a U.S. citizen to pursue a claim against the Cuban government in Cuban courts is subject to the political interference of the Cuban government and, thus, that there are serious impediments to the ability of a U.S. citizen to pursue effectively a lawsuit against the Cuban government.

As stated in the Department's most recent (2001) Report on Human Rights Practices in Cuba, "Cuba is a totalitarian state controlled by President Fidel Castro ... [who] exercises control over all aspects of life through the Communist Party and its affiliated mass organizations, the government bureaucracy headed by the Council of State, and the state security apparatus."[1] There is no independent judiciary or judicial system in Cuba today. The Cuban judicial system is subject to the political control of the Cuban government. While it appears that at least some Cuban courts have jurisdiction to hear a claim against the Cuban government brought by any individual (including U.S. citizens), the Human Rights Report notes that the Cuban constitution "explicitly subordinates the courts to the [National Assembly of Peo-

ple's Power] and the Council of State, which is headed by President Castro."[2] The Department's Human Rights Report also notes that the "subordination of the courts to the Communist Party, which the Constitution designates as the superior directive force of society and the State, further compromises the independence of the judiciary."[3] In addition, article 10 of the Cuban constitution provides that "all organs" of the Cuban government, including the courts, "are obliged to strictly observe socialist legality and to ensure respect for it in the life of the entire society."[4] Thus, political control over the Cuban judiciary is accomplished both by functional oversight and by a substantive legal requirement.

Cuban judicial decision-making is compromised by the political influence of the Cuban government. The Human Rights Report notes that the "panels composed of a mix of professionally certified and lay judges" preside over civilian courts at the municipal, provincial and supreme court levels.[5] Lay judges are selected, in part, for their political obedience to the Cuban government. Since juries are not used in Cuba, these mixed panels of professional judges and lay judges are the decision-makers. Within Cuba, the United States is the subject of constant antagonism and vitriol expressed by the Cuban government. It is within this environment that both professional judges and lay judges must make decisions. The Department believes that the professional and lay judges considering a claim by a U.S. citizen against the Cuban government are inherently subject to constant governmental pressure, without any of the safeguards that typically protect an independent judiciary.

Cuban lawyers are also subject to the control and political influence of the Cuban government. Cuban laws have been used to deprive certain individuals who have criticized the Cuban government or defended

1. Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, Country Reports on Human Rights Practices—Cuba, at 1, (Apr.2002), *available at* http://www.state.gov/ g/drl/rls/hrrpt/ 2001/wha/ [hereinafter "Human Rights Report"].

2. *Id.*

3. *Id.* at 7.

4. Constitucion de Cuba, art. 10, *translated in* Constitutions of the Countries of the World: Republic of Cuba 4 (ed. Gisbert Flanz, 2000).

5. Human Rights Report, *supra* note 1, at 7.

human rights cases of their ability to practice law in Cuba.[6] In the Human Rights Report, the Department concluded that "the control that the Government [of Cuba] exerts over the livelihood of members of the state-controlled lawyers' collectives compromises their ability to represent clients, especially when they defend persons accused of state security crimes."[7] The Department also noted in the Human Rights Report that "[a]ttorneys have reported reluctance to defend those charged in political cases due to fear of jeopardizing their own careers."[8] Given the constant hostility articulated by the Cuban government towards the United States, representing a U.S. citizen in a case against the Cuban government appears to present the same governmental intimidation and offers the same career hazard.

Treatment of U.S. citizens by the Cuban government in the past has evinced a general disregard for their rights. For example, when the Castro regime took power, the Cuban government took into state ownership most of the property in that country owned by the United States and its citizens.[9] The Foreign Claims Settlement Commission (FCSC) noted in 1972 that "[n]o provision was made by the Cuban Government for the payment of compensation for such property as required under generally accepted rules of international law."[10] In fact, the 5,911 claims of U.S. citizens and corporations certified by the FCSC, most resulting from these nationalizations, remain unresolved today. As valued by the U.S. Foreign Claims Settlement Commission (FCSC), these claims today are worth approximately $6.3 billion, including accrued interest.

Certain U.S. citizens have been subjected to gross mistreatment by the Cuban judicial system, as documented by the FCSC. For example, Cuba tried, convicted and executed Howard F. Anderson in 1961 for alleged crimes against the Cuban government. The FCSC determined that the "lack of opportunity for defense attorneys to prepare arguments for the trial and subsequent appeal, the actions of the prosecutor at the trial, the changing of the crime charged by the appeals court, the inconsequential acts of Mr. Anderson who was not a member of any group acting against the Cuban Government, and the animosity toward Americans resulting from the Bay of Pigs," resulted in a "denial of justice by the Government of Cuba."[11] Similarly, the FCSC concluded that the execution of Robert Otis Fuller in 1961 "for the same crime for which two Cuban nationals were sentenced to thirty years imprisonment, was clearly a discrimination directed to persons alien to the Republic of Cuba, being disproportionate to the punishment meted out to the Cuban nationals," and therefore was "a denial of justice."[12] While somewhat dated examples, they remind us of the over forty-year animosity that has been expressed both in and out of the Cuban courtroom. We have no reason to believe that current Cuban judicial processes would be less subject to the political requirements of the current Cuban government.

The information available to the Department is limited, largely because of the Cuban government's anti-democratic restrictions on the flow of information in Cuba and its restrictions on the activities of officers serving in the U.S. Interests Section in Havana. Nonetheless, the Department of State hopes that the information provided herein is help-

6. The Inter–American Commission reported that "attorneys who prepare and sign briefs with positions critical of the situation of the nation or the profession" have been called to meetings to be prohibited from practicing law. Cuba, Inter–Am. C.H.R. 677, 693, OEA/Ser.L/V/II.114 Doc. 5 rev 1 (2002).

7. Human Rights Report, *supra* note 1, at 7.

8. *Id.*

9. U.S. For. Claims Settlement Comm'n, Final Report of the Cuban Claims Program 69 (1979),

*reprinted from* U.S. For. Claims Settlement Comm'n, Annual Report to Congress (1972).

10. *Id.*

11. In the Matter of the Claim of Dorothy McCarthy, et al., U.S. For. Claims Settlement Comm'n, Dec. No. CU–6244, at 8 (1971).

12. In the Matter of the Claim of Jennie Fuller, et al., U.S. For. Claims Settlement Comm'n, Dec. No. CU–6199, at 9 (1971).

ful to the Court in its consideration of the above captioned case.

Sincerely
Daniel W. Fisk
Deputy Assistant Secretary of state for Western Hemisphere Affairs